

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00014-CR

———————————————————

JOSE FERNANDEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 16th District Court
Denton County, Texas
Trial Court No. F17-857-16

---

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

A jury found appellant Jose Fernandez guilty of driving while intoxicated with two prior DWIs, a third-degree felony. *See* Tex. Penal Code Ann. §§ 49.04(a), 49.09(b)(2). After finding an enhancement paragraph true, the jury assessed Fernandez's punishment at 11 years in prison. *See* Tex. Penal Code Ann. § 12.42(a). The trial court sentenced Fernandez, and he appealed.

In his first issue, Fernandez argues that the trial court erred by admitting evidence that, while being transported to jail, he claimed to be related to El Chapo and, by implication, part of the Sinaloa cartel; he contends its prejudicial value substantially outweighed any probative value. In his second issue, Fernandez argues that the evidence was insufficient to show that he operated a motor vehicle while intoxicated. We affirm.

## The evidence shows Fernandez operated a motor vehicle while intoxicated.

Because Fernandez's second point, his sufficiency complaint, would result in greater relief if granted, we address it first. *See Mixon v. State*, 481 S.W.3d 318, 322 (Tex. App.—Amarillo 2015, pet. ref'd).

Fernandez argues that the State failed to prove that he operated a motor vehicle because the evidence showed that the two officers who testified to having seen him when he pulled into a parking lot and got out of his vehicle could not have seen him from their vantage point of an apartment complex's second-floor landing. He contends that the evidence shows that a carport would have blocked their view.

2

Because whether he operated a motor vehicle is the only element Fernandez contests (and not whether he was intoxicated), we limit our discussion to that element. *See* Tex. R. App. P. 47.1, 47.4; *McIntyre v. State*, No. 02-17-00167-CR, 2018 WL 1866083, at *3 (Tex. App.—Fort Worth Apr. 19, 2018, no pet.) (mem. op., not designated for publication) (contesting only whether appellant was intoxicated and not whether he was driving).

## A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227,

232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

## B. Discussion

Around 2:30 a.m. on January 1, 2017, Officer Jameson Ruff was dispatched to the Pinnacle Apartments in Lewisville on a burglary-in-progress call. Climbing the stairs to the second floor, he encountered the apartment's occupants, whom he described as frightened and upset. While Officer Ruff was talking to them, they saw Fernandez's pickup pulling into the parking lot, which prompted new jitters. Officer Ruff asserted that he had a view of the parking lot from the second-floor landing and that he saw Fernandez get out of his vehicle. Although there were trees and a carport, Officer Ruff said neither blocked his view.

Also responding to the call was Officer Jeffrey Pitman, who arrived at the scene after Officer Ruff and joined him either on or near the second-floor landing. He too described how the apartment's occupants became jumpy when they saw Fernandez's pickup pulling into the parking lot. Officer Pitman stated that he could see Fernandez's vehicle moving in the parking lot and ending up parked in the fire lane near a building across from the covered parking and that he then saw Fernandez

4

get out of the vehicle. Like Officer Ruff, Officer Pitman acknowledged that the apartments had a carport and trees but denied that anything blocked his view.

Fernandez's daughter, Banesa Carlos, who lived in the apartment along with Fernandez, her mother, and her siblings, testified that it was not possible to see the parking lot when standing at the apartment's door. Six photos—from ground level— showed the second-floor apartment, the stairs, and the carport. But Carlos also acknowledged that from where she was standing on the landing, she could see the police cars parked near her father's pickup; she could see cars parked against the far curb in the parking lot; and she saw the police put her father in a squad car.

Viewing the evidence in the light most favorable to the verdict, Officer Ruff, Officer Pitman, and Carlos all testified that from the landing, they could see into the parking lot and could see Fernandez's pickup or the patrol cars. And other evidence showed that from the second floor, the apartment's occupants became agitated when they saw Fernandez drive into the parking lot; by implication, their view was not blocked. We hold that a rational factfinder could have found beyond a reasonable doubt that Fernandez operated a vehicle while intoxicated. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. We overrule Fernandez's second issue.

**The trial court did not abuse its discretion by admitting the evidence showing that Fernandez claimed that El Chapo was his uncle.**

## A. Fernandez's contention

In his first issue, Fernandez argues that the trial court erred by admitting testimony and video evidence in which Fernandez claimed to be related to El Chapo and, inferentially, connected to the Sinaloa cartel. According to Fernandez, this evidence's prejudicial value substantially outweighed any probative value. *See* Tex. R. Evid. 403.

## B. The evidence

Because neither Officer Ruff nor Officer Pitman spoke Spanish and so could not communicate with Fernandez, they called Spanish-speaking Detective Antonio Barletta, who at the time was a patrol officer, to perform the field sobriety tests. After Fernandez failed the tests, Detective Barletta arrested him. While Detective Barletta was transporting Fernandez to the jail, video captured the two conversing in Spanish; when the State played the video to the jurors, Detective Barletta translated it for them.

On the video, Detective Barletta asked Fernandez where he was from, and Fernandez responded that he was from Sinaloa, Michoacán, and that El Chapo was his uncle. Not taking Fernandez seriously, Detective Barletta responded that coincidentally El Chapo was his uncle too, so that made them cousins. Detective Barletta's understanding was that El Chapo ran a drug cartel in Sinaloa. In Detective Barletta's estimation, an arrestee's volunteering to a police officer that he was related

to El Chapo was not something that a person would do if the person had the use of his normal mental faculties. He thought that Fernandez was joking.

## C. Standard of review

Rule 403 provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. At the outset, we recognize that Rule 403 favors admitting relevant evidence and presumes that relevant evidence will generally be more probative than prejudicial. *See Wells v. State*, 558 S.W.3d 661, 669 (Tex. App.—Fort Worth 2017, pet. ref'd) (citing *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006)). Appellants must overcome this presumption and show that the danger of unfair prejudice or the danger of misleading the jury substantially outweighs the evidence's probative value. *Id.*

When conducting a Rule 403 analysis, a trial court must balance

- the proffered evidence's inherent probative force along with

- the proponent's need for that evidence against

- the evidence's tendency to suggest deciding an issue on an improper basis,

- the evidence's tendency to confuse or distract the jury from the main issues,

- the evidence's tendency to encourage the jury to give it undue weight because it lacks other information needed to evaluate the evidence's probative force, and

- the likelihood that presenting the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gonzalez v. State*, 544 S.W.3d 363, 372 (Tex. Crim. App. 2018).

The evidence's probative force refers to how strongly it serves to make a consequential fact more probable or less probable. *Id.* Virtually all evidence that a party offers will prejudice its opponent's case; prejudicing the opposition's case is precisely why the party offers it. *Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007). So, some evidence prejudices an opponent but does so fairly by making a fact of consequence more or less probable. *See* Tex. R. Evid. 401. But the rules recognize that other evidence, although relevant, may prejudice an opponent unfairly. *See* Tex. R. Evid. 403. Rule 403 is concerned only with "unfair" prejudice. *Gonzalez*, 544 S.W.3d at 373.

Unfair prejudice refers not to evidence's adverse or detrimental effect but to its undue tendency to suggest deciding a consequential issue on an improper basis—such as an emotional one. *Casey*, 215 S.W.3d at 883. Evidence is unfairly prejudicial if it has the capacity to tempt factfinders into finding guilt for reasons other than the evidence specific to the offense charged. *Gonzalez*, 544 S.W.3d at 373.

We review the trial court's decision to admit or exclude evidence—including its decision regarding whether the danger of unfair prejudice substantially outweighs the disputed evidence's probative value—under an abuse-of-discretion standard. *Id.* at 370. Decisions lying outside the zone of reasonable disagreement constitute an abuse

8

of discretion. *Id.* Provided the trial court's ruling falls within the reasonable-disagreement zone, we may not substitute what we would have done for what the trial court actually did. *Id.*

**D. Discussion**

The State wanted Fernandez's El Chapo comment admitted to show that Fernandez was intoxicated:

> [T]he State is offering that portion of the video and that evidence as evidence of intoxication. That a normal non-intoxicated person, the State's argument will run, will sit quietly in handcuffs in the back of a police car and not say anything. Whereas an intoxicated person might make some grandiose claims about their uncle being El Chapo or being connected . . . to the Sinaloa cartel and those type of things.
>
> The State is not offering these for the purpose of connecting him to the Sinaloa cartel or Senior Guzmán or anything like [that]. We're simply offering these for evidence of an intoxicated person making grandiose claims to a police officer.

Initially, we note that the complained-of evidence contained some probative force for the proposition that Fernandez was intoxicated. Detective Barletta thought that Fernandez was boasting, that El Chapo's being Fernandez's uncle was ludicrous, and that Fernandez's linking himself to El Chapo (and by implication, a drug cartel) was not something a person in his right mind would do. To Detective Barletta, Fernandez's making that statement to him reflected very poor—or very impaired—judgment. *See id.* at 372.

On the other hand, the State's need for the evidence was arguably marginal—the State had the field sobriety test on video and Detective Barletta's testimony that

9

Fernandez had failed the horizontal-gaze-nystagmus test, the walk-and-turn test, and the one-leg-stand test. And despite Fernandez's blood not having been drawn until five and a half hours after his arrest, he nevertheless had a blood alcohol level of .236—nearly three times the legal limit. *See id.*

Understandably, Fernandez focuses his arguments on the evidence's tendency to promote a guilty verdict on an improper basis. Linking Fernandez to El Chapo and drug cartels, he argues, would enflame jurors' minds. *See id.* If the State had presented the evidence as truthful, we might agree, but here the State presented it as drunken prattle.

And because the State presented the evidence to show Fernandez's intoxication, the evidence focused on one of the main issues; the State did not use Fernandez's comment to confuse or distract the jury. *See id.* In fact, the parties' final arguments underscored how neither side believed Fernandez was really related to El Chapo. Defense counsel pitched Fernandez's comment as "joking around," while the prosecutor acknowledged that Detective Barletta never felt threatened and noted how odd Fernandez's comment was—a normal arrestee would skirt mentioning any ties to a drug lord.

Next, the evidence did not consume an inordinate amount of time and did not repeat other evidence. Detective Barletta related what Fernandez had said and how he (Detective Barletta) had reacted to it. And on cross-examination, Detective Barletta

clarified that Fernandez mentioned only El Chapo and not the drug cartel and reaffirmed that he thought Fernandez was joking. *See id.*

Finally, a forensic scientist testified that someone with a .236 blood-alcohol content—which was what Fernandez still had hours after his arrest—would lose the use of his mental and physical faculties. The jury was thus equipped to evaluate Fernandez's bluster as probative evidence showing intoxication and, simultaneously, to discount its weight as the truth, especially when Detective Barletta himself regarded Fernandez's statement as farcical. *See id.*

We hold that the trial court's ruling does not lie outside the zone of reasonable disagreement and thus that the trial court did not abuse its discretion. *See id.* We overrule Fernandez's first issue. *See Casey*, 215 S.W.3d at 883–84 ("The photographs of the naked unconscious woman (or women) having sex acts performed upon them were certainly prejudicial. And it is undisputed that the photographs would generate an emotional response. . . . However, the trial judge did not abuse her discretion" because the photographs circumstantially showed that the complainant did not consent and, further, showed "a [modus operandi] of group sex, drugs, and photography and rebutted the defensive theory that [the complainant] brought the drugs, initiated the sex, and consented to the photography.").

## Conclusion

Having overruled Fernandez's two issues, we affirm the trial court's judgment.

11

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 6, 2020