

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00028-CR

———————————————————

FREDDIE PILAR BUSTOS, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court No. 1472251D

_____

Before Gabriel, Kerr, and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Freddie Pilar Bustos was convicted of aggravated assault for shooting his then-wife. On appeal, he contends that the trial court should have admitted her medical records, arguing that they were necessary to impeach her false testimony concerning a mental health consultation she had years prior to the shooting.

But there was no lie to impeach—Complainant readily admitted the very propositions he sought to prove—and the records had nothing to do with the shooting. Therefore, in its discretion, the trial court therefore could have rightly excluded the records as irrelevant. Moreover, Bustos was attempting to undermine Complainant's general credibility using events unrelated to this case, and the court could thus have properly disallowed the records as impeachment concerning a collateral matter. We therefore affirm.

## I.    BACKGROUND

At trial, Complainant summarized the history of her relationship with Bustos. She explained that she began dating him in 2012, and by the end of the year, they had moved in together. According to Complainant, their relationship was always violent and volatile, with frequent separations and reconciliations.[1] But the couple was in a

---

[1] In 2013, for instance, Bustos beat her as they drove home after a night at a club and forced her out of the car around 1:00 in the morning, leaving her without a phone in a strange area. The next day, Bustos apologized, and they made up, but within four months' time they had broken up and reconciled many times over. In another incident during a period when they had separated, the father of Complainant's children came over to see the children (or, according to Bustos, slept over), and he found Bustos

2

good patch in September of 2016. Bustos was drinking less and treating her better, and they were taking family trips together. Complainant described their relationship, in that moment, as "perfect."

On Sunday night of Labor Day weekend, Bustos suggested that they go out. They went to a pool hall around midnight, where they ordered drinks. Bustos was snappish and angry. Complainant thought food might improve his spirits, so she asked to go to Taco Bell. As they entered the drive-through, Bustos had a pearl-handled .22 pistol on his lap, as he often did while driving. The two ordered food and left.

Bustos wanted to go to a strip club and rob a patron. Complainant asked to be taken home. Bustos began calling her names and took her to the club anyhow. The club was empty when they arrived, so, there being no one to rob, Bustos ordered a bucket of beers. By the time the club closed thirty minutes later, Bustos's mood had worsened. Complainant began to have doubts about their relationship as they drove away.

Complainant suggested that they go back to Taco Bell. When Bustos pulled into the parking lot, she told him that she could not be with him anymore. Bustos was furious. He took the pistol from his lap and whipped her face. He then shot at her and

---

lurking in her backyard in the early morning. Bustos attacked him with a baseball bat and was arrested. By 2014, the couple had reconciled and married. By 2016, during a period when they had again separated and Bustos had moved out, Complainant awoke to find Bustos in her room, "furious" at finding text messages between her and "another gentleman." Bustos broke her phone and threw it out his car window as he drove away.

3

missed.  Complainant tried to get out of the car, but Bustos sped away before she could do so.

Bustos drove onto the highway and stopped suddenly on the shoulder.  He said, "Get out now, bitch," and fired several shots at her.  Complainant's eyes went blurry, and she felt blood dripping from her face.  Some of the shots had missed, but one had ripped through her left eye and come out near her temple, and another had glanced off her skull.  Complainant pleaded with him to stop, but Bustos told her "to just sit back and die" and started driving again.  She asked him to take her to the hospital, saying that she would not tell anyone he had shot her, and eventually Bustos complied.  Bustos let her out a few blocks from the hospital and drove off.  Complainant flagged down a passing motorist, who took her to the emergency room.  She lost her left eye.

A few weeks after the shooting, Bustos called Complainant and apologized.  Bustos asked her to come to San Antonio, where he was hiding from authorities.  She agreed and drove to meet him.  During their rendezvous, the two pulled up to a store together, and a SWAT team swept in behind them and arrested Bustos.

On cross-examination, Bustos tried various approaches to undercut Complainant's credibility.  For example, he impeached the clarity of her memory, both in general and on the night of the shooting, and he drew out inconsistencies in her testimony, such as when she downplayed the amount she had to drink that night.

However, the trial court prevented Bustos from developing another angle of attack, which is the subject of this appeal.  Bustos cross-examined Complainant about

4

her mental health, asking if she had sought "any kind of therapy or counseling before." She initially denied receiving any such treatment. However, seconds later, she asked for clarification of Bustos's question. When the question was clarified, she responded that she had one mental health consultation years before the shooting, though she could not recall whether the consultation was in 2007 or 2008.

To impeach her recollection, Bustos offered medical records concerning that consultation. The records would have informed the jury that the consultation took place in 2010, not 2007 or 2008. The records reflected that Complainant was still suffering from her mother's death the year before, and she had a violent outburst during a fight with her then-significant other; Complainant cried, slashed his tires, and scraped her wrist with a knife, leading her to seek treatment. The records also disclosed that one of Complainant's family members had bipolar disorder.

The State objected to the medical records, arguing that they were irrelevant under Rule of Evidence 401 and substantially more prejudicial than probative under Rule 403. The trial court sustained both objections and excluded the evidence. However, the trial court allowed Bustos to clarify the date of the consultation; on further examination, Complainant agreed that it took place in 2010.

After the close of the evidence, the jury found Bustos guilty of aggravated assault. Bustos pleaded true to a repeat-felony-offender enhancement, and the trial court assessed punishment at forty-five years' confinement. He appeals.

## II.    Discussion

In his sole point, Bustos argues that the trial court abused its discretion when it excluded Complainant's medical records.   According to Bustos, the records were essential to impeaching Complainant's account of her mental health consultation and the confrontation that precipitated it.  He asserts that, contrary to the State's objections at trial, this evidence passes muster under Rules 401 and 403.[2]

If the trial court's evidentiary ruling is correct under any applicable theory of law, it will not be disturbed.  *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). We review the trial court's decision to exclude evidence under an abuse of discretion standard.  *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018).  A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Id.*  We may not substitute our own decision for that of the trial court.  *Id.*  Different trial judges may reach different conclusions in different trials on substantially similar facts without abusing their discretion.  *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018).  "A trial court judge is given considerable latitude with regard to evidentiary rulings." *Id.*

Relevant evidence is generally admissible, and irrelevant evidence is not. *Gonzalez*, 544 S.W.3d at 370.  Under Rule 401, relevant evidence is evidence which has

---

[2]Bustos did not preserve any argument related to the Confrontation Clause, and we therefore do not consider its application to these facts. *See Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005).

any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Id.* "Evidence does not need to prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence." *Id.*

In his brief, Bustos offers only one reason why the medical records were relevant. He argues that during cross-examination, Complainant "unequivocally denied from the witness stand in the presence of the jury . . . ever having been treated for mental health issues." He says that the medical records, which confirmed that she did in fact have a mental wellness consultation, would have shown that she "was lying to the jury from the witness stand" and undercut her credibility as the sole eyewitness to the shooting.

But Bustos mischaracterizes this evidence when he says it demonstrates that Complainant lied about her mental health treatment, and he overstates the evidence's probative value. Rather, as we explain, the trial court could have rationally concluded that the evidence was irrelevant because (1) the supposed "lie" was simply a misstatement produced by unclear questioning; (2) any mistaken impression left by her response was resolved seconds later, after the question was clarified; and (3) the evidence itself was entirely unrelated to any issue of consequence in the case.

The disputed testimony occurred as counsel for Bustos subtly switched topics. Counsel had been asking Complainant a series of questions about events in the days after the shooting. Counsel asked her to review medical records concerning her treatment at the hospital, and Complainant obliged. Counsel also asked whether she

spoke to detectives at the hospital, and she said she had. Counsel then inquired whether she was taking any kind of medication while she was in the hospital or on the day of her release, and Complainant explained that she had discontinued medication by the time she was discharged. Counsel asked, "Were you in any kind of therapy or counseling?" Complainant replied that she was not.

Then, without clearly indicating that she was transitioning to a new area of inquiry unrelated to the immediate aftermath of the shooting, counsel asked whether Complainant had "ever done any kind of therapy or counseling before?" She responded that she had not. However, moments later, Complainant asked for clarification of the question and, upon clarification, readily admitted that she had a mental health consultation years prior to the 2016 shooting:

Q. Had you ever sought any kind of treatment for any kind of mental health or stress issues?

A. Not that I know of.

Q. So you didn't really—you were just able to handle all this yourself?

A. This—this, what I'm going through right now?

Q. This or any other episode in your life.

A. Just back in 2007 and I think 2008, my mom passed away so I checked myself into JPS to get some medicine. They discharged me within 12 hours and said I was just having a depressed moment and prescribed me some pills.

Q. Do you recall what year that was?

A. 2007, '08. I'm not for sure.

This was the totality of the "lie" that Bustos sought to use her medical records to expose: in response to an unclear shift in the subject of questioning, Complainant gave a mistaken response that she corrected seconds later, when the question was clarified. Similarly, Complainant initially could not remember the exact year the consultation occurred, but upon further examination, she readily agreed that the year was 2010. The medical records would have had little probative value in impeaching her concerning things she freely admitted, because there was little contradiction to impeach. *See Hager v. State*, 734 S.W.2d 180, 183 (Tex. App.—Eastland 1987, pet. ref'd) (concluding that when the theft defendant, a jeweler, admitted that a previous customer had accused him of switching rings left for repair, there was nothing left to impeach, and the previous customer's testimony concerning that incident should not have been admitted as impeachment).

Moreover, beyond the fact that Complainant admitted the very propositions which Bustos claims the medical records would have proved, those propositions were already at the margins of relevance. The unrelated facts described in the medical records—a 2010 confrontation with a different man, leading to a consultation in which she was not diagnosed with any disorder—would have done nothing to complete the jury's picture of the 2016 shooting. *See Patrick v. State*, No. 05-18-00435-CR, 2018 WL 3968781, at *1, *25–26 (Tex. App.—Dallas Aug. 20, 2018, no pet.) (mem. op., not designated for publication) (upholding the exclusion of the complainant's records which documented her mental health problems and her confrontation with a CPS

9

worker, because the confrontation occurred long before the complainant's murder and was unrelated to the circumstances of the offense or to the defendant—a boyfriend with whom she had a volatile relationship). And considering that Complainant testified about the consultation nearly nine years after it occurred, her inexact memory of the date proved little beyond what was already self-evident: human memory's limited ability to hold mundane details over long periods. *See Goggans v. State*, No. 05-90-00761-CR, 1992 WL 134744, at *4 (Tex. App.—Dallas June 4, 1992, no pet.) (per curiam) (not designated for publication) (upholding exclusion of "irrelevant" questions concerning complainant's memory of events unrelated to and occurring long before the assault, calling it "common knowledge" that memory of trivialities fades over time). This discrepancy in dates would hardly tend to show that a woman with a glass eye could have forgotten the bullet, the gun, and the man who gave her the glass eye. Because the content of the medical records was scarcely probative of the issues in this case— and because Complainant freely admitted that content, leaving little room for impeachment—the trial court could have properly excluded the medical records as irrelevant.

In the alternative, even assuming that the medical records held probative value, the trial court could have just as readily concluded that this impeachment evidence concerned a collateral matter, in that it went only to Complainant's general credibility as demonstrated through facts unrelated to the shooting. The trial court therefore could

have properly excluded the medical records as impeachment concerning a collateral matter.

In general, a defendant is not entitled to impeach a witness regarding collateral matters. *Wamsley v. State*, No. 2-06-089-CR, 2008 WL 706610, at *8 (Tex. App.—Fort Worth Mar. 13, 2008, pet. ref'd) (mem. op., not designated for publication) (citing *Ramirez v. State*, 802 S.W.2d 674, 676 (Tex. Crim. App. 1990)). A collateral matter is one which seeks only to test a witness's general credibility or concerns facts irrelevant to the issues at trial. *Id.* (citing *Keller v. State*, 662 S.W.2d 362, 365 (Tex. Crim. App. 1984), and *Cortez v. State*, No. 2-05-147-CR, 2006 WL 1563275, at *11 (Tex. App.— Fort Worth June 8, 2006, pet. ref'd) (mem. op., not designated for publication)); *cf. Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009) ("[T]here is an important distinction between an attack on the general credibility of a witness and a more particular attack on credibility that reveals 'possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.'" (quoting *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974))). But a question is not collateral if it seeks to test the truthfulness of a witness's testimony on direct concerning the facts and circumstances surrounding the criminal transaction. *Keller*, 662 S.W.2d at 365.

Thus, in a case where the defendant was accused of sexual assault, we held that the defendant was not entitled to impeach the complainant on her testimony concerning how many nights she had previously spent in the neighborhood where the

11

offense occurred; we held this to be a collateral detail unrelated to the true issues at trial. *Holloway v. State*, 695 S.W.2d 112, 118–19 (Tex. App.—Fort Worth 1985), *aff'd*, 751 S.W.2d 866 (Tex. Crim. App. 1988). In another case, where the defendant was accused of murdering his parents, we held the defendant was not entitled to impeach his sister concerning her testimony that the victims had always supported her, for this impeachment would only undermine his sister's general credibility vis-à-vis matters unrelated to the murders. *Wamsley*, 2008 WL 706610, at *8.

If the medical records held probative value, any probative value would flow from their tendency to impeach Complainant over collateral matters: her general credibility as demonstrated by matters unrelated to the case. The medical records reflected that in 2010, she became hysterical during a fight with her then-boyfriend and slashed his tires and her wrist, leading her to seek a mental health consultation. But the consultation and the outburst that precipitated it were not related to the circumstances under which Bustos shot her. The outburst and consultation occurred two years before Complainant even met Bustos and six years before the shooting. Bustos has not suggested that these events reveal something about what occurred on the night of the offense; he does not claim that Complainant was hysterical prior to the shooting or that she was the aggressor. Rather, any probative value would stem from the records' tendency to test Complainant's general credibility and memory concerning unrelated events. The medical records and their subject matter were thus collateral to the issues in the case.

The trial court was within its discretion to disallow the medical records on grounds of relevance, and it could have also done so on grounds of collateral impeachment. We therefore hold that the trial court did not exceed its "considerable latitude" in excluding the evidence. *See Fowler*, 544 S.W.3d at 848. We overrule Bustos's sole point.

### III.   Conclusion

We affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  April 23, 2020