NEWELL, J., delivered the unanimous opinion of the Court.
Appellant, Juan Antonio Gonzalez, was charged with capital murder of a police officer. The jury found him guilty of the lesser charge of murder and sentenced him to fifty years' imprisonment. During the trial, the State introduced evidence that Appellant had taken ecstasy earlier in the day while at school and that he had additional ecstasy pills in his possession when he committed the offense. The court of appeals reversed, holding the admission of the drug evidence was erroneous and *365 harmful. We granted review to determine whether the court of appeals erred in its analysis regarding the admission of the drug evidence and its harm. While we agree that the evidence was erroneously admitted, we disagree that the admission of the evidence was harmful. We will reverse.
Background
On September 25, 2012, Appellant and his two friends, Alan Medrano and Juan Gomez, were walking home from school.[1] Gomez "keyed" several parked cars as they walked down Trowbridge Avenue, a residential street in El Paso. One of those cars belonged to police officer Jonathan Molina, who was off-duty at the time. Molina confronted Gomez. There is some dispute as to what occurred next, but the encounter eventually escalated into a fight. During the fight, Appellant used a judo move to take Molina to the ground causing Molina's head to strike the sidewalk. The blow to Molina's head caused a fatal brain injury.[2]
The State's Case
The details of the incident were presented by three passerby witnesses, Mario Ramos, Laura Mena, Erin Lile, and Appellant's friend Medrano.[3] The passerby witnesses did not know Appellant, Appellant's friends, nor Molina prior to the day of offense. At trial, they referred to Appellant and his friends as "the teenagers," differentiating between them by their physical descriptions and involvement in the incident. They each testified that Appellant was easily identified as the tallest of the three teenagers. They referred to Molina as "the older man." For clarity, we refer the participants by their names.
Mario Ramos was driving westbound on Trowbridge Avenue between 5:00 p.m. and 6:00 p.m. on the day of the incident.[4] He noticed a group of males standing close to each other and their body language caught his attention. He pulled over two or three houses down and observed the situation through his side-view mirror. He noticed that Appellant was arguing with Molina, and the other two teens were not involved. Ramos could not hear the argument between them. Appellant had his back to Ramos, preventing Ramos from seeing Appellant's facial expressions and blocking Ramos's direct view of Molina. Ramos observed Appellant punch Molina and both men fell; Molina did not see how they landed. About ten seconds later, Appellant and his friends began walking away and then broke into a run. Ramos performed a U-turn with his vehicle. He saw Molina on the ground, apparently seizing, and called 911. Ramos followed the teens for about *366 two and a half minutes before losing sight of them. Later at the police station, Ramos identified Appellant out of a line-up, but qualified the identification: Appellant was "one of the guys that was in the group but not sure."
Laura Mena was also driving westbound on Trowbridge Avenue between 4:30 p.m. and 5:00 p.m. Mena noticed a group of people in the driveway of a house with an elderly woman sitting on the porch. Mena made a U-turn because she thought there was going to be a fight and she didn't want the elderly woman to see it. By the time she parked and exited her car, Appellant and his friends were already walking down the street and Molina was on the ground. Mena called out to the teens to come back, but Appellant threw his hand up in the air and pointed his index finger skyward; they did not return. Mena noticed Molina was having some type of seizure and she called 911.
Erin Lile was driving eastbound on Trowbridge Avenue with her daughter that afternoon. She saw what looked like an after school fight. As she passed the group, Appellant and Molina raised their arms to each other, then broke apart and backed up from each other. Then, from her rear view mirror, she saw Appellant "bum rush" Molina, which she described as running towards him and knocking him off his feet. Appellant then jumped on top of Molina and started "pummeling" him, which Lile described as punching him in the face. Lile then made a U-turn. She noticed Molina was making a snoring sound and was trying to get up. His forehead was knotted up and his whole face was "blown up" from being injured. Lile noticed Molina had a gun on his waistband and instructed Laura Mena, who was on the phone with the police, to tell them that Molina had a gun. She sent her daughter back to the car and they stayed at the scene until the police let them go.
The State also called Appellant's friend, Alan Medrano, to testify.[5] According to Medrano, he was walking home from school with Appellant and Gomez along Trowbridge Avenue. As they were walking, Medrano noticed that Gomez had a piece of metal and was scratching cars.[6] One of the cars turned out to be Molina's. As they were crossing the street, Medrano heard Molina yelling from his house to come back; he testified that Molina was mad and aggressive. However, Medrano had originally told the police that Molina was not mad and just yelled "Hey bro." According to Molina, the three ignored Molina and kept walking.
When they were on the next block down, Molina pulled up beside the boys in his car. Molina got out of his car and asked Gomez why he scratched his car; Gomez denied scratching the car and the two began to argue. According to Medrano, Molina started to curse at Gomez, calling him a "little kid" and a "fag," but Medrano's earlier statement to the police never included that word. Less than a minute into the argument between Molina and Gomez, Appellant stepped in. Medrano explained that Appellant tried to calm the situation by telling Molina to "chill out." Appellant and Molina began to argue and got closer to each other. Molina told the three teens to "get the fuck out of there," but Appellant replied that it was a public sidewalk.
*367 Molina then told Appellant that he was a police officer. Appellant demanded to see Molina's badge and Molina responded, "I don't have to show you shit." Medrano's prior statement to the police, however, indicated that when Appellant asked to see Molina's badge, Molina merely told the elderly woman on the porch to "call the cops, call the police." Medrano testified that the argument continued, with Molina and Appellant getting within three inches of each other before Molina pushed Appellant with his shoulder. According to Medrano, Appellant responded immediately by hitting Molina, though Medrano later acknowledged that he had told the police earlier that Molina had turned his attention away from Appellant and began to yell at Gomez when Appellant hit him. According to Medrano's statement to the police, Appellant hit Molina "because he got mad." Medrano testified that Molina then raised his hands as if he was ready to fight before Appellant hit him again. However, Medrano did not mention that Molina had put his fists up in his police statement.
Then, according to Medrano, Appellant took Molina down by "kind of tripping him." Medrano explained that Appellant "picked him [Molina] up from the legs and dropped him." Once Molina was down on the sidewalk, Appellant quickly got on top of him and punched him in the face two or three times. Medrano testified that Molina was putting his hands up as Appellant punched him, but this was not in his prior police statement either. Once Molina stopped responding, Appellant stopped hitting him and Medrano told him they needed to leave. Medrano told the police that Molina looked "stiff" and was just lying there with his eyes closed.
As they walked away, they ignored the call of someone to come back and then they started to run. Medrano testified that Appellant was "really, really mad" and that Molina had "really pissed [him] off." Appellant complained that he did not know why Molina yelled at him, that Molina was not his father, and was no one to be yelling at him like that.
Appellant's Testimony
Appellant testified in his defense. According to Appellant, he and his friends got out of school at 3:45 p.m. and had walked to a mechanic's shop to see if Medrano's car was ready for pick up. When the car was not ready they continued to walk home. Appellant testified that as they were walking Molina came out of his house and called out, "You fucking faggots." Appellant and his friends ignored Molina and kept walking at a normal speed, neither speeding up nor slowing down. Then Molina pulled up alongside them in his car, got out appearing very angry, and yelled at Gomez, "Hey you faggot ... Why the fuck did you scratch my car?" Gomez denied doing anything and Gomez and Molina began to argue and curse at each other. Appellant felt that the argument was getting heated and pulled Gomez back, telling him and Molina to calm down. Then Molina started to curse at Appellant.
Appellant claimed that he told Molina that Gomez had not done anything so he should let the boys go home. Appellant felt that Molina was being aggressive in his comments, and his threats caused Appellant to fear for himself and his friends. Appellant said it looked like a big guy, Molina, was going to hurt this little kid, Gomez. Although Appellant was taller than Molina, Molina was considerably stockier. Appellant claimed he did not feel like he could leave because Molina had followed them once before and he thought Molina would follow them again and hurt them. When Molina kept arguing, Appellant got upset and started to swear at Molina.
*368 Appellant and Molina got close to each other and Molina said "Get out of here. Get the fuck out of here. You have nothing to do here. This is not your business. Just leave, you little punk." Molina then said he was a police officer and Appellant asked to see his badge. Molina said "I don't have to show you shit" and told an older woman who witnessed the exchange from her porch to call the police. Appellant told Molina he was seventeen years old and that Molina can't hit him; Molina responded that he didn't care how old Appellant was and that he would "kick your [Appellant's] ass and the rest." Molina then shoved Appellant with his right hand and Appellant immediately responded by hitting Molina twice because he was scared.
Appellant then grabbed Molina and pushed him to the ground. Appellant described taking Molina down as grabbing "him from the legs and then [I] just pushed him to the floor." Appellant fell on top of Molina as Molina was using his legs to kick Appellant off. Appellant hit Molina two more times until Molina stopped fighting back. When he walked away, Appellant testified that it looked like Molina was trying to get up and gather himself. However, in a Facebook message Appellant sent later that evening, he described Molina as "twitching and bleeding." As they walked away, Appellant and his friends talked about planning a birthday party for Medrano. When they heard someone say they were calling the police, they got scared and ran home. According to Appellant, when he arrived home he heard on the news that a man had been killed in central El Paso and he broke down crying. He told the jury that he never meant to kill Molina and that he only got involved in the fight because he feared for himself and his friends.
The State also elicited testimony that Medrano had trained at a boxing gym for five or six months when he was fourteen or fifteen. Medrano had shared the moves he learned at boxing with Appellant. Additionally, Appellant had taken two to three months of judo classes years before the incident, and he had taught Medrano the judo moves. One of the judo moves Appellant knew involved taking a person down by grabbing their legs, picking them up, and using their own force against them. Appellant and Medrano would practice these moves, and other skills on each other, a few times a week.
Facebook Messages After the Fight
The trial court also admitted several Facebook messages Appellant sent and received on the day of the incident. One series of messages were from the evening of the incident. That evening, Appellant sent three messages to Medrano. The first was sent at 5:49 p.m. and stated "I hope you didn't get caught. I killed the guy. He went into compulsions [sic] and died." Appellant testified that he believed he had killed Molina because of a false news report he viewed. At 6:25 p.m. Appellant sent another message to Medrano saying, "Haha jk Weii I seen that shit on the news." Appellant said he sent the second message after he saw a corrected news story that reported that the man was still alive. At 6:49 p.m. Appellant sent a final message to Medrano stating, "Dude turn on the news dude there's all this crap going on."
Appellant also messaged his girlfriend that evening that he might go to jail because he and "two friends walked home and this guy starting [sic] talking shit to us, and at first I told him to back off and he pushed me so I punched him, then tackled him, then punched him again ...." He also messaged her that "It's not my fault tho he was like 30 and twice my size ... I'm really really really scared" and "I
*369 shouldn't have hit him, I don't know what I was thinking." Additionally, he told his girlfriend in a message that Molina was twitching and bleeding when they ran away.
Facebook Messages Regarding Appellant's Drug Use
The other series of Facebook messages related to Appellant's use and possession of ecstasy. Most of these messages were sent while Appellant was in school. At 10:32 a.m. he sent a message to his girlfriend that he was "rollin at school." His girlfriend asked if it was "with our pills" and he replied, "no with my extra one I still have our pills." Appellant testified that the pills were ecstasy pills. At 10:44 a.m. Appellant sent his girlfriend a message that he was "shaking" and "it's starting to hit me." Then he messaged her that "I don't wanna roll in class" and that he trips "bad at school." Appellant assured his girlfriend that he was saving two pills for them to use later. Then he said "Oh, God, babe stay with me. I'm starting to trip bad." The last message sent at school was at 10:58 a.m. and Appellant said, "I only freak out at school other than that I'm fine." As the court of appeals noted, this amounted to a time gap between the taking of the pill and the offense at anywhere between six and seven hours.[7]
When asked if he was still under the influence of the pill when he was walking home, Appellant said he was not. Later that evening, Appellant messaged his girlfriend that he was going to "flush our pills." The State did not mention the ecstasy pills again after it finished questioning Appellant about them during cross-examination. This portion of the cross-examination regarding these Facebook messages covered five pages of Appellant's thirty-two page cross-examination.
Court of Appeals Opinion
On appeal Appellant challenged, among other things, the admission of evidence that he took ecstasy on the day of the confrontation and that he had ecstasy pills in his possession earlier that day. Appellant argued that the evidence was not relevant, that its prejudicial value outweighed its probative value, and that it was improper character evidence. The State argued that the evidence was relevant to Appellant's state of mind and self-defense claim, which was a central issue in the case. Therefore, according to the State, it was not character conformity evidence and its probative value substantially outweighed any prejudice.
In addressing the relevance of the evidence, the court of appeals asked "was evidence of Appellant's use of ecstasy some six hours before the murder relevant to any issue in the case?"[8] It determined the answer was no. Given the time period in this case and lack of evidence of the effects of the drug on Appellant at the time of incident, the court held that the evidence "fails the basic relevance test."[9] Because it held the evidence was irrelevant to Appellant's state of mind, the court also concluded that admitting the evidence ran afoul of the prohibition against using evidence of a crime, wrong, or other act as character evidence.[10] The court went on to hold that even if there were some slight relevance to the evidence, it would be substantially outweighed by the danger of unfair *370 prejudice.[11] Specifically, the evidence raised concerns of swaying the jury on an improper bias, distracting the jury, or allowing the jury to place undue weight on evidence it was ill-equipped to evaluate.[12]
The court's harm analysis hinged on the nature of the evidence.[13] The court noted that the bystanders's testimony was limited and they did not hear the conversation between Appellant and Molina.[14] Further, inconsistency in Medrano's testimony and his early statements hampered his credibility.[15] Thus, in the court's view, Appellant's case rose and fell with his credibility and suggesting that he was high on drugs would certainly influence his credibility.[16] In holding that Appellant's substantial rights were affected, the court stated that placing the "imprimatur of drugs and drug use on Appellant's testimony could well have changed the jury's calculus."[17]
Analysis
We granted review to determine whether the court of appeals erred in holding that the drug evidence was erroneously admitted and that Appellant was harmed by the admission of the evidence. As discussed below, we agree that the drug evidence was erroneously admitted. Nevertheless, we hold that Appellant's substantial rights were not affected and therefore he was not harmed.
Standard of Review
We review the trial court's decision to admit or exclude evidence, as well as its decision as to whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice, under an abuse of discretion standard.[18] A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement.[19] We may not substitute our own decision for that of the trial court.[20]
Relevant evidence is generally admissible, irrelevant evidence is not.[21] Relevant evidence is evidence which has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence.[22] Evidence does not need to prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence.[23]
Evidence of a defendant's "other crimes, wrongs, or acts" is not admissible to prove the character of a person in order to show that he acted in conformity with that character.[24] However, evidence of *371 such prior bad acts may be admissible if it has relevance apart from its tendency to prove character conformity.[25] If evidence of prior bad acts is not relevant apart from supporting an inference of character conformity, it is absolutely inadmissible under Rule 404(b).[26] Additionally, if the probative value of the relevant evidence is substantially outweighed by the danger of unfair prejudice, the evidence is also inadmissible under Rule 403.[27]
Evidence of Appellant's Prior Drug Use Was Inadmissible
The State argues that Appellant's use of ecstasy on the day of the murder was relevant to his claim of self-defense, in that his "intoxication would tend to make it less probable that his belief that the degree of force he used was immediately necessary was objectively reasonable."[28] We agree that evidence of intoxication at the time of a murder can be relevant in a given case.[29] We have held that evidence of extraneous offenses can be admissible to show the context and circumstances in which the criminal act occurred.[30]
However, evidence of drug use is not relevant if it does not apply to a "fact of consequence."[31] For example, in a case involving an allegation of driving while intoxicated, evidence of drug use has, at a minimum, relevance to one of the allegations in a charging instrument, namely the consumption of an intoxicating substance.[32] Even if we assume that drug use in this case is relevant to the defendant's state of mind at the time of the offense, any relevance of that evidence necessarily depends upon the ability to infer intoxicating effects from the fact of consumption of the controlled substance.[33] The strength of that inference will naturally depend upon such factors as when the drug was taken, how much of it was taken, how long the effects of the particular drug last, and whether intoxication with a particular drug is such a common occurrence that its recognition *372 requires no expertise.[34] At some point, the evidence of drug use could be so far removed in time from the commission of the offense that it would become irrelevant because it could not support any inference of intoxication during the commission of the offense. Ultimately, we need not decide the precise outer boundaries of the relevance for the prior drug use in this case. Even if we assume that Appellant's drug use six-to-seven hours before the offense was relevant, the trial court abused its discretion by determining that its probative value was not substantially outweighed by the danger of unfair prejudice.
Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." In Gigliobianco v. State , we outlined the balancing a trial court must make when conducting a Rule 403 analysis.[35] The court must balance:
(1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.[36]
The probative force of evidence refers to how strongly it serves to make the existence of a fact of consequence more or less probable.[37] In the case at hand, the evidence established that Appellant consumed an ecstacy pill approximately six-to-seven hours prior to the incident and that he possessed more ecstacy pills. The record was silent as to what type of drug ecstasy is, what the intoxicating effects of ecstasy are, and how long those effects persist.[38] Assuming the relevance of the evidence, the inference that Appellant was actually under the influence of ecstasy at the time of the offense was weak at best.
The State's need for the evidence was equally weak. We evaluate the State's need for the evidence by looking at whether the fact related to a disputed issue and whether the State had other evidence establishing that fact.[39] While Appellant did dispute the suggestion that he was intoxicated, the State had other, more compelling evidence rebutting Appellant's self-defense claim. There was eyewitness testimony that Appellant threw the first punch and that he later fled from the scene. Appellant's Facebook messages demonstrated a cavalier attitude about killing the victim, and testimony from his friend established *373 that Appellant had lashed out in anger rather than out of concern for anyone's safety. Further, the low probative value of the evidence also lowered its ability to directly rebut Appellant's self-defense claim.
Conversely, evidence of Appellant's drug use and possession in school had the potential to impress the jury in some irrational and indelible way. As we have explained, Rule 403 is only concerned with "unfair" prejudice.[40] Evidence is unfairly prejudicial if it has the capacity to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged.[41] The evidence of Appellant's prior drug use had great potential to lure the jury to declaring guilt based upon Appellant's delinquent behavior at school independent of the specific offense charged. Even assuming the evidence was relevant, the probative force of the evidence rested entirely upon the ability to draw an inference of intoxication at the time of the offense. Without additional evidence regarding the effects of taking ecstasy several hours prior to the offense or testimony equating Appellant's behavior with intoxication, the jury was ill-equipped to evaluate the probative force of the evidence.
Finally, the time needed to develop this evidence was minimal. This resulted in less time to distract the jury from consideration of the indicted offense. While this factor weighs in favor of admission of the evidence, it is not enough to carry the day. The evidence still carried with it the potential to confuse and distract the jury. Consequently, the evidence was inadmissible under Rule 403.
Admission of Prior Drug Use Was Not Harmful Error
The erroneous admission of evidence is non-constitutional error.[42] Non-constitutional errors are harmful, and thus require reversal, only if they affect Appellant's substantial rights.[43] We have construed this to mean that an error is reversible only when it has a substantial and injurious effect or influence in determine the jury's verdict.[44] If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction.[45] In making this determination, we consider: (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error.[46]
Significantly, the State did not emphasize the drug evidence in this case beyond introducing it. The entirety of the evidence relating to Appellant's drug use and possession was elicited in five pages of the State's thirty-two page cross-examination of Appellant. Much of those five pages consists of questions related to the smiley faces and emojis used between Appellant and his girlfriend in the messages.
The State did not bring the drug evidence up at all during the rest of trial. The *374 prosecutor did not mention it during closing argument.[47] While the court of appeals regarded the State's reference to Facebook messages in its closing argument as emphasizing the drug evidence, a review of the record shows these references specifically directed the jury to the messages sent after the incident and not the messages regarding Appellant's drug use and possession.
The State referenced Facebook messages four times during its closing argument. First, the State directed the jury to the messages Appellant sent to Medrano after the incident about the news report Appellant reportedly saw indicating a man had been killed. Second, the State pointed out inconsistencies between two of Appellant's messages which read: "Oh, my gosh, I'm scared, I'm sad. I realize how serious the situation is at this point." and "Ha-ha. Ha-ha." Third, the State stated "Look at the messages the defendant writes right after this happened." Lastly, the State pointed to the messages Appellant sent his girlfriend after the fight explaining what had happened. In this section, the State focuses on Appellant's comment "I shouldn't have hit him[,]" but does not reference the messages regarding the remaining ecstasy pills. We disagree with the court of appeals that the State emphasized the evidence of drug use in this case.
The court of appeals noted that the character of the drug evidence was disturbing to the average juror.[48] As discussed above, we recognize that this evidence was prejudicial in that it could have distracted the jury from the indicted offense. However, we must view this evidence in connection with the other evidence in the case. The drug evidence was brief in comparison to the evidence of the confrontation between Appellant and Molina, and it was not the focus of the State's case. When viewed in connection with the other evidence in this case we cannot say that it was so emotionally charged as to prevent the jury from rationally considering the rest of evidence before it.[49]
The majority of the evidence in this case came in through the eyewitness testimony of those involved in the incident and three bystanders. All three bystanders identified Appellant as the aggressor in the confrontation. These bystanders did not know any of the participants of the incident and their unbiased recount of the events provided evidence of Appellant's guilt.
Additionally, Medrano, Appellant's friend, provided incriminating evidence that supported a finding of guilt. In his statement to the police on the day of the incident Medrano indicated that Appellant hit Molina and knocked him down because Appellant was mad. In the statement, Medrano stated that Molina had turned his attention away from Appellant when Appellant hit him.
Medrano's statements are consistent with the bystander's recollection of the events and Appellant as the aggressor, particularly in regard to Erin Lile's testimony indicating that Appellant and Molina had separated from each other before Appellant "bum rushed" Molina. Medrano's police statement also indicated that Molina was not aggressive when he first encountered the three boys. Though Medrano's trial testimony painted a different picture, his earlier police statement contradicted many of those assertions. Moreover, Medrano's police statement did not just contradict his own trial testimony, it also contradicted *375 Appellant's testimony. While the court of appeals noted these inconsistencies generally, these inconsistencies themselves can be viewed as evidence of Appellant's guilt.[50]
Most importantly, the evidence of Appellant's drug use and possession was not the only evidence that called Appellant's credibility into question. The trial was riddled with inconsistencies between Appellant and Medrano's trial testimony and prior statements made at the time of the incident. Given the amount of inconsistencies between the trial testimony and the prior statements, we are not convinced that the brief discussion of Appellant's drug use and possession would influence the determination of the jury's verdict. Having reviewed the record as a whole, we have a fair assurance that the admission of the drug evidence had but a slight effect on the jury's verdict; therefore, we do not find that Appellant's susbstantial rights were affected.
Conclusion
The low probative value of Appellant's Facebook messages concerning his drug use six-to-seven hours prior to the offense was substantially outweighed by the danger of unfair prejudice. Consequently, the trial court abused its discretion in admitting these Facebook messages. However, given the nature of the evidence of guilt and the State's lack of emphasis on the evidence, we have fair assurance that the admission of this evidence did not affect Appellant's substantial rights. The judgment of the court of appeals is reversed and the case is remanded for consideration of Appellant's remaining grounds of error.

At the time of the offense, Appellant was seventeen years old, Medrano was nineteen years old, and Gomez was eighteen years old.

Molina had a severe contusion to the back of his head consistent with an uninterrupted fall. The fight took place in an area where the concrete was irregular and it jutted up like a teepee. Molina's skull was fractured from the back extending over the skull cap to the left frontal area. Molina died ten days after the injury from a subarachnoid hemorrhage that lead to swelling, which shut down his other bodily functions. Dr. Juan Contin, a medical examiner, testified that the blow to the back of the head was the unsurvivable injury, the punches sustained after Molina fell to the ground had nothing to do with his cause of death.

Gomez invoked his right not to incriminate himself and did not testify.

The exact time of the incident is not clear from the record. Two of the witnesses, Mario Ramos and Laura Mena, testified to the approximate time they recalled driving on Trowbridge Avenue and seeing the incident. We provide these times as references to the approximate time of the incident.

Though he was not initially treated as a hostile witness, the State asked permission to treat him as such as Medrano began contradicting his earlier statements to the police.

On cross-examination by Appellant, Medrano denied seeing Gomez scratch the cars. In both his police statement after the incident and his testimony on direct examination he stated he did see Gomez scratching cars.

Gonzalez v. State , No. 08-14-00293-CR, 2017 WL 360690, at *8 (Tex. App.-El Paso Jan. 25, 2017) (not designated for publication).

Gonzalez, 2017 WL 360690, at *9

Id. at *10.

Id.

Id.

Id.

Id.

Id. at *11.

Id.

Id.

Id.

Martinez v. State , 327 S.W.3d 727, 736 (Tex. Crim. App. 2010).

Id.

Moses v. State , 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

Tex. R. Evid. 402 ("Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution or Texas Constitution; a statute; these rules; or other rules prescribed under statutory authority. Irrelevant evidence is not admissible.").

Tex. R. Evid. 401.

Stewart v. State , 129 S.W.3d 93, 96 (Tex. Crim. App. 2004).

Tex. R. Evid. 404(a).

Tex. R. Evid. 404(b).

Montgomery v. State, 810 S.W.2d 372, 387 (Tex. Crim. App. 1991).

Id.

A person is justified in using deadly force against another: (1) if he would be justified in using force against another under section 9.31 of the Texas Penal Code ; and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use of attempted use of unlawful deadly force. See Tex. Pen. Code § 9.32.

See, e.g., Moreno v. State , 721 S.W.2d 295, 301 (Tex. Crim. App. 1986) (noting that "it has long been the rule in this State that the jury is entitled to know all relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum."); Brooks v. State , 599 S.W.2d 312, 320 (Tex. Crim App. 1979) (holding evidence of Brook's heroin use was admissible to show the context of how he and two accomplices knew each other and was inseparable from the events leading up to the death of the murder victim); Albrecht v. State , 486 S.W.2d 97, 100 (Tex. Crim. App. 1972) (noting that the jury has a right to hear what occurred immediately prior to and subsequent to the commission of the act in order to realistically evaluate the evidence).

See ids="10117852" index="18" url="https://cite.case.law/sw2d/486/97/#p100">id.

Manning v. State , 114 S.W.3d 922, 927 (Tex. Crim. App. 2003) ; see also , Henley v. State , 493 S.W.3d 77, 83 (Tex. Crim. App. 2016) (noting that for evidence to be relevant it must be addressed to "any fact that is of consequence to the determination of the action.").

Manning , 114 S.W.3d at 927.

See Henley , 493 S.W.3d at 84 (noting that a "fact of consequence" includes either an elemental fact or an evidentiary fact from which an elemental fact can be inferred).

C.f. Smithhart v. State , 503 S.W.2d 283, 286 (Tex. Crim. App 1973) (noting that intoxication by alcohol is of such a common occurrence that recognition of signs of alcohol intoxication requires no special expertise).

210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

Id.

Id. at 641.

The Facebook messages indicate that Appellant was shaking and freaked out when he was in school and the ecstasy "hit" him several hours before the offense, but there was no evidence of the effect of the drug on a person's mental state or how long the effects of the drug might last.

State v. Mechler , 153 S.W.3d 435, 441 (Tex. Crim. App. 2005).

Manning , 114 S.W.3d at 927.

Id. at 928.

Taylor v. State , 268 S.W.3d 571, 592 (Tex. Crim. App. 2008).

Tex. R. App. Proc. 44.2(b).

Taylor , 268 S.W.3d at 592.

Id.

Motilla v. State , 78 S.W.3d 352, 356-58 (Tex. Crim. App. 2002).

Id. at 359 (finding that the State did not emphasize the error when the prosecutor did not mention the complained of testimony during closing argument).

Gonzalez , 2017 WL 360690, at *11.

Motilla , 78 S.W.3d at 359.

See Guevara v. State , 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (noting inconsistent statements are probative of wrongful conduct and are also circumstances of guilt).