**Affirmed and Memorandum Opinion filed May 23, 2023**



In The

# Fourteenth Court of Appeals

## NO. 14-21-00661-CR

**NATHANIEL JULES PRADIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 337th District Court
Harris County, Texas
Trial Court Cause No. 1599590**

## MEMORANDUM OPINION

Appellant Nathaniel Jules Pradia appeals his conviction of murder. In four issues he argues that the trial court erred in admitting text messages at trial because they interjected "racial issues" into the trial as well as "vulgar" and "obscene" language. We affirm.

**ADMISSION OF TEXT MESSAGES**

Appellant argues that the substance of four text messages admitted into evidence over objection were vulgar and "unfairly prejudiced appellant in the eyes of the jury." Appellant argues that the messages interjected race into the trial because of the use of racially charged language and were, therefore, highly prejudicial. Appellant argues that the evidence was cumulative of other evidence introduced by the State and not needed to prove the case against appellant.

## A. General Legal Principles

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018); *Seidule v. State*, 622 S.W.3d 480, 489 (Tex. App.—Houston [14th Dist.] 2021, no writ). "A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement." *Gonzalez*, 544 S.W.3d at 370. "We may not substitute our own decision for that of the trial court." *Id*.

Generally, relevant evidence is admissible, while irrelevant evidence is not. Tex. R. Evid. 402; *Gonzalez*, 544 S.W.3d at 370. Evidence is relevant when it has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. Tex. R. Evid. 401. The evidence offered does not need to prove or disprove a certain fact by itself to be relevant; it is sufficient if the evidence "provides a small nudge toward proving or disproving a fact of consequence." *Gonzalez*, 544 S.W.3d at 370. Generally, the State is entitled to present on rebuttal any evidence that tends to refute a defensive theory and the evidence introduced to support that theory. *See Flannery v. State*, 676 S.W.2d 369, 370 (Tex. Crim. App. 1984); *Laws v. State*, 549 S.W.2d 738, 741 (Tex. Crim. App. 1977).

Even if the relevant evidence is offered and admissible, a trial court may nonetheless exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403; *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990); *Bargas v. State*, 252 S.W.3d 876, 892–93 (Tex. App.—Houston [14th Dist.] 2008, no pet.). A trial court must balance the following factors when making a Rule 403 analysis:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). When the record is silent as to the trial court's balancing of these factors, we presume the trial court conducted the balancing test. *Id.* at 893. We review a trial court's ruling under Rule 403 for an abuse of discretion. *Montgomery*, 810 S.W.2d at 391.

## B. Background

Appellant was charged with the murder of Jeremy Gregory and pleaded not guilty. At the time of the murder, appellant was living with his girlfriend, Rachel. Appellant and Rachel dated for a time and broke up. During their break-up, Rachel dated Jeremy. Ultimately, Rachel ended the relationship with Jeremy and resumed her relationship with appellant. Appellant admitted to shooting Jeremy in the driveway of Rachel's home. Appellant's defensive theory was that he shot Jeremy in self-defense during an argument. Appellant raised this theory in his opening statement, indicating that the evidence would show that Jeremy was much

larger than appellant, came to the house uninvited. and appellant was "in fear for his life" when he shot Jeremy.

During Rachel's testimony, the State offered the text messages into evidence. Appellant objected and argued that the messages were not relevant "to the case," what happened on the day of the shooting, and that they were more prejudicial than probative. The trial court overruled the objections and admitted the text messages.

Eight exhibits containing four text messages were admitted over appellant's objection.[1] Exhibits 106 and 120 were of the following exchange:

> [Appellant:] I told you it's only about a drink a high a club and a fuck them niggas nor yo white boy going to stay down with you they ain't worried about no kids no bills no groceries or your house and the up keep of but they will walk that bitch down and fuck you in it and go about there business I had allot of respect for you at one time but it seems that you have just lost focus I'm just glad you don't have me to blame for the things that's going on around you

> [Rachel:] Our relationship did me in I guess. I been through so much I guess that was what did me in. I lost it all. Keep me in your prayers that I get my head back in

Exhibits 107 and 117 were of the following exchange:

> [Appellant:] Really it ain't nothing what you thinking It's the fact that I can't believe you fucked around with that many people so quickly after being with me for so long and slept with a few and slept with me in between it all let's keep it real I was still around and in the mix it's nasty and distasteful and disrespectful I can't allow you after all you have said and down the way you talked done to me you really treated me like shit and like you never knew me I can still clearly screaming telling me I don't want you and you didn't want to fuck with me and that I wasn't the man for you I would be a fool to allow you to tear down my situation and walk out of my life again I'm not really what

---

[1] The eight exhibits represented four text messages—four exhibits were taken from Rachel's phone and four were taken from appellant's phone.

4

your looking for and I'm no rebound nigga you move to quickly when it comes to men and If the right one comes along or this white boy decided he wanted to fuck with you there you go off again It's a dangerous game you play and if I was into sharing my woman I could have stayed with my ex

Exhibits 108 and 118 were of the following exchange:

[Appellant:] When me and you started dating you wanted me to be tested which was alright by me I felt like you were protecting yourself and being responsible as a woman how many out of the last four you had tested before or after you slept with them you told pretty much told me that you sleep the white boy unprotected you put your birth control thing back in so you couldn't get pregnant you never used protection with that guy you know I'm right I don't know what happened with the others yes the times I've had sex with the young lady I'm currently seeing we used protection me and you were in a very comfortable place sexually If you're coming for me and my time and company and as someone I care for and love come with good intentions not to hurt or tear down and destroy fuck with me because you really miss me and because you really want me and because you realize you really do love me not because you ain't vibing with ya man right now don't use me to get back at him if he may have done something that upset you or hurt you work it out with him I wish you would have did that with me worked it out.

Exhibits 109 and 119 were of the following exchange:

[Rachel:] I'm in bed

[Appellant:] You where you need to be ma if you ever give another matha fucka my pussy I'm going to kill you and him real shit don't play with me Rachel I'm coming for you

[Rachel:] Emphasized "you where you need to be ma if you ever give another matha fucka my pussy I'm going to kill you and him real shit don't play with me Rachel I'm coming for you"

[Rachel:] Don't say things like I'm going to kill you!!!!

[Appellant:] You my woman always

[Rachel:] You cannot threaten folks' lives

[Appellant:] I'm all about us Rachel you know me

[Rachel:] ljs . . . . . you talking about killing ppl. I ain't tryna die behind no nigga!!!!

[Appellant:] I'm in bed I love you get some rest lady I got you

Rachel testified regarding the text messages and read the text messages to the jury. She testified that the messages were sent by appellant when she was dating Jeremy and that "white boy" referred to Jeremy. Rachel testified she was alarmed that appellant would threaten to kill anyone but that she continued to talk to appellant because she loved him. She testified that shortly after the text exchanges she and Jeremy broke up and she resumed her relationship with appellant.

Rachel testified that after she and appellant resumed their relationship, appellant was still upset about Rachel's relationship with Jeremy, and it was an "ongoing issue." She and appellant would fight about the prior relationship, and appellant was angry. On one occasion during such a fight the police were called. Rachel testified that appellant would continue to instigate "verbal disagreements" with her regarding Jeremy until the day of the murder.

Rachel testified that on the morning on the day of the murder she received a text message from Jeremy. In response to this message, she deleted Jeremy's text and "blocked" his number. She testified that she was concerned appellant would see the message or hear a missed call and it would "be a problem." In the early afternoon, Rachel received a phone call from a number she did not recognize. She answered the phone and heard Jeremy's voice respond. She testified that she got off the phone with him quickly because appellant was nearby, and she was worried about his reaction. Rachel testified that she blocked this phone number as well because she was worried about having another disagreement with appellant.

Rachel testified that she went about her day, running errands while appellant did some yard work at the house. When she stopped at home between errands, she

and appellant were talking in the garage. At this point appellant told Rachel that he just saw the "white boy" drive by the house, meaning Jeremy. Rachel testified that appellant "insisted" that Jeremy had driven past the house and asked her, "You think I don't know what this big retarded motherfucker looks like?" Appellant then began another argument with Rachel. Rachel testified that to "dispel the argument that I knew was growing, we both go in the house so that he can go with me to run errands."

After appellant changed his clothes, they both went back to the garage and got into Rachel's car. Rachel testified that she keeps a gun in the glovebox of her car. Rachel was in the driver's seat and appellant was in the passenger's seat. They were about to leave when appellant saw Jeremy walking up the driveway. Appellant quickly got out of the car saying to Rachel, "I told you it was that motherfucker." Appellant confronted Jeremy in the driveway. Rachel testified that Jeremy was just walking up the driveway at a "regular pace." Rachel followed appellant into the driveway and yelled at Jeremy to leave. She testified that she was telling Jeremy to leave because "I know [appellant]." Rachel testified that appellant never went back to the car after the altercation began.

Rachel testified that everything happened very quickly—all three were arguing and yelling at one another when appellant shot Jeremy. Rachel grabbed appellant while Jeremy ran back to his vehicle and attempted to get in on the driver's side, but appellant followed Jeremy and shot him two more times. Rachel testified that Jeremy raised his arms to shield his body when appellant shot at him. Rachel testified that she then retreated to the house to call for help and wanted to help Jeremy, but she was too scared of what appellant would do to her if she tried. Rachel testified that no physical altercation occurred between any of the parties

prior to the shooting and that they were all just yelling at one another. She also did not see Jeremy with any weapon.

In his closing statement, appellant argued that at the time of the argument he had a reasonable fear for his own safety because Jeremy was almost twice appellant's size and had confronted him at his and Rachel's home. Appellant further argued that he had a reasonable fear that Jeremy was returning to his vehicle to obtain a weapon and that is why he continued to shoot at him. After considering the evidence, the jury convicted appellant of murder.

## C.    Analysis

Appellant argues that the text messages "unfairly prejudiced appellant in the eyes of the jury" because they interjected race into the trial by using certain vulgar and racially charged terms. Appellant states that he and Rachel are both African American while Jeremy was Caucasian. Appellant further argues that the texts were cumulative of other evidence introduced by the State and, therefore, not necessary to prove the State's case against appellant.

### 1. Probative Value of the Evidence

Appellant admits that the probative value of the evidence and the State's need for it weighs in favor of admission because the messages "arguably" show appellant's feelings for Rachel and his "jealous nature which may have affected his state of mind when [Jeremy] confronted appellant and Rachel." We agree that the messages evidence appellant's anger that Rachel dated Jeremy, indicating a motive and willingness to kill Jeremy, rebutting appellant's self-defense theory. *See Lopez v. State*, 314 S.W.3d 54, 62 (Tex. App.—San Antonio 2010, pet. ref'd) (holding trial court did not abuse discretion in admitting text and voice message exchanges despite the use of profane and vulgar language because they supplied evidence of

8

motive); *Sandoval v. State*, 409 S.W.3d 259, 298 (Tex. App.—Austin 2013, no pet.) ("Evidence to show motive is the circumstantial evidence that would appear to cause or produce the emotion that would in turn provoke or incite the commission of the criminal offense.").

## 2. Potential to Impress the Jury in Some Irrational, yet Indelible Way

Appellant argues that the messages had the potential to impress the jury in some irrational but indelible way and weighs against admission because of the use of "extremely offensive" and "vulgar" language. However, the language used evidences appellant's anger toward Jeremy in the messages and tends to show that appellant acted out of anger in shooting Jeremy, rather than self-defense. *See Roberts v. State*, 795 S.W.2d 842, 845 (Tex. App.—Beaumont 1990, no pet.) ("[V]ulgar allegations appellant complains of are expressions of the threat to the complainant and thus have probative value."); *Pennick v. State*, No. 03-14-00334-CR, 2015 WL 7973742, at *3 (Tex. App.—Austin Dec. 2, 2015, no pet.) (mem. op., not designated for publication) (concluding that video recording of the defendant's "vulgar" and "disrespectful" statements to arresting officer "were not . . . so inflammatory that they would cause the jury to make a decision on an improper, irrational basis" and "were strong evidence of [the defendant's] state of mind"); *Hinson v. State*, No. 02-06-00407-CR, 2008 WL 204272, at *6 (Tex. App.—Fort Worth, Jan. 24, 2008, pet. ref'd) (mem. op., not designated for publication) ("The disputed statement was probative of [the defendant's] state of mind and consciousness of guilt. . . . Any inflammatory effect was outweighed by the statement's probative value."). The statements here were not so inflammatory to suggest conviction on an improper basis. Further, the language used by appellant in the text messages, though at times vulgar, was no worse than the language Rachel testified appellant used in other conversations about Jeremy—

none of such testimony was objected to. *See Cable v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010) ("[E]rroneously admitting evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'" (quoting *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998))).

### 3. Time Needed to Develop the Evidence

Appellant argues that the third factor weighs against admission because the messages did not "relate directly to the shooting" and "required a large amount of time" where the jury was "distracted by the vulgarities and the details of the sexual relationships which Rachel [] had with appellant and [Jeremy]." Because these were distractions from the indicted offense, appellant argues that this factor weighs against admission. We disagree. The messages related to the relationship between appellant and Rachel in the weeks prior to the murder and were directly related to appellant's state of mind and motivation for shooting Jeremy and countering appellant's contention that he acted in self-defense. During trial, there were other references to appellant's use of the term "white boy" to describe Jeremy that were not objected to. There were also other instances of appellant's use of crude language that was similarly not objected to. Rachel's testimony regarding the text messages was brief, she read each into the record to the jury and then testified about the status of her relationship with appellant and Jeremy in the three weeks leading up to the murder. We disagree that the presentation of the text messages "required a large amount of time."

### 4. Proponent's Need for the Evidence

Appellant argues that the fourth factor also weighs against admission because the State had presented evidence that appellant shot Jeremy and appellant "never denied or contested the fact" that he shot Jeremy. Appellant argues that the

State had "ample evidence regarding" the relationship between appellant and Rachel, as well as the relationship between Rachel and Jeremy and, therefore, did not need the text messages to prove the alleged offense or rebut appellant's claim of self-defense. While Rachel's testimony provided context for the relationships between the parties, the text messages showed, in appellant's own words, his animus towards Jeremy. We disagree that the text messages were merely cumulative. *See Lopez v. State*, 200 S.W.3d 246, 253 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) ("Evidence which shows appellant's motives . . . was important to the State's case" and overcame Rule 403 challenge).

After considering and weighing the factors, we conclude that the trial court's decision to admit the evidence on the facts herein was not outside the zone of reasonable disagreement. *See Gonzalez*, 544 S.W.3d at 370. We overrule appellant's issues on appeal.

## CONCLUSION

Concluding that the trial court did not abuse its discretion in admitting the text messages, we need not address appellant's arguments regarding harm. *See* Tex. R. App. P. 47.1. We affirm the judgment of the trial court.


/s/ Ken Wise
   Justice


Panel consists of Justices Wise, Jewell, and Poissant.

Do Not Publish — TEX. R. APP. P. 47.2(b).

11