**Opinion issued November 25, 2025.**



**In the**

# Court of Appeals

**for the**

# First District of Texas

————————————

**NO. 01-23-00832-CR**

————————————

**CARLOS DANIEL GUTIERREZ-ESPINOSA, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 3**
**Harris County, Texas**
**Trial Court Case No. 2425676**

---

**MEMORANDUM OPINION**

A jury convicted appellant Carlos Daniel Gutierrez-Espinosa of assault of a family member. *See* TEX. PENAL CODE § 22.01. The trial court assessed punishment at one year in county jail, suspended his sentence of confinement, and placed him on community supervision for two years. In his sole issue, appellant

complains that the trial court erred in admitting the audio recording of a 9-1-1 call based on a business records affidavit that, he contends, did not adequately identify the recording because it did not distinguish between two 9-1-1 calls produced by the State. Because we hold that any error in the admission of the audio recording was harmless, we affirm.

## Background

Complainant is appellant's wife. Complainant testified that, on September 25, 2022, appellant struck her 20 to 25 times with his hand at their residence. According to complainant, after appellant took out a mop to clean up the blood from complainant's resulting wounds, appellant hit complainant seven to 10 times with the mop. Complainant testified that appellant's mother, Katia Gutierrez (Gutierrez), and complainant's three children (the youngest two of whom are also appellant's biological children) witnessed appellant strike her in the face with his closed fist before Gutierrez took appellant's two biological children to another room. Shortly after the assault, complainant called 9-1-1 with the help of the 11-year-old daughter (M.A.,[1] appellant's stepdaughter), who remained with her. Complainant was taken to a hospital. Complainant's injuries included a facial contusion and a scalp laceration, for which she received six skin staples.

---

[1] We use a pseudonym to refer to complainant's minor child. *See* TEX. R. APP. P. 9.10(a)(3), (b) (providing that court filings in criminal cases must not contain sensitive data, including names of minors).

2

Appellant told the first responder who arrived first at the scene that he had had not hit complainant, had only pushed her, and that she had inadvertently hit a door hinge. At trial, appellant testified that he had seen complainant physically harming M.A., intervened to protect the child, and in the process of doing so pushed complainant in the hip. Appellant stated that complainant then slipped, lost her balance, and fell by the door.

### 1.  State's production of audio recordings of 9-1-1 calls

In advance of appellant's trial, the State produced documents and other items to defense counsel via item-specific links in an electronic discovery portal. Among the items produced by the State were audio recordings of two 9-1-1 calls, one of which was the call made by complainant minutes after the assault. The other 9-1-1 call was a later call made by a different person—likely Gutierrez. Both audio recordings were timely produced via the electronic portal on the same date, along with a business records affidavit. In the discovery portal, the produced items were listed, with links, in the order in which they were produced:

1. The recording of complainant's 9-1-1 call,

2. The business records affidavit, and

3. The recording of the second 9-1-1 call.

## 2.    Introduction of complainant's 9-1-1 call at trial

Only the audio recording of complainant's 9-1-1 call was offered by the State into evidence at trial. At the time the State sought to introduce that recording, State Exhibit No. 16, defense counsel objected to its admission on hearsay grounds. Defense counsel stated that the business records affidavit, which was produced on the same day as the two audio recordings, related to only one audio recording and did not identify which one. Defense counsel argued that the affidavit was "materially defective because it [did not] establish with any level of particularity which 911 call in order to authenticate and provide a basis for," and that the State should not be permitted to "cherry pick which [9-1-1 call recording] they want to admit." The prosecutor responded that the business records affidavit made the recording self-authenticating, and that any business record affidavit related to the second 9-1-1 call would have appeared in the discovery portal as a link *below* the link to the recording of the second 9-1-1 call. The trial court admitted State Exhibit No. 16 over appellant's hearsay objection.

## 3.    Content of complainant's 9-1-1 call

The audio recording of complainant's 9-1-1 call is roughly 12 minutes long. Complainant is crying throughout the call and at times seemingly struggles or is unable to speak. She states that she needs help. In response to questions she is asked by the Emergency Medical Services (EMS) operator whom the 9-1-1

4

operator adds to the call, complainant states that her husband hit her, that she is bleeding from the head, and that there is blood "everywhere." In response to continued questioning, complainant states that she is 31 years old, that the injury has just occurred, that her husband is still nearby, and that no weapon was involved. Complainant confirms that there is "serious bleeding." Complainant says that she is not having trouble breathing, but is having trouble staying awake. In response to instructions from the EMS operator regarding getting a towel or something similar to help stop the bleeding, complainant states that she is in the foyer with nothing around her and cannot get up from the floor. When asked if there is anyone else "there with you guys," complainant says "yeah, but they're not going to help me." Complainant says that she can taste blood in her mouth. When asked what was happening before appellant hit complainant in the head, complainant says that they were arguing, and that appellant refused to call 9-1-1, was beating her, and had taken her phone. When asked who is in the house "with you all," complainant says "his mother" and "my kids." At this point, an unidentified man and woman can be heard speaking in the background. When the EMS operator asks if one of complainant's children can bring her a towel, complainant calls out asking M.A. to bring her a towel. The unidentified man can then be heard saying "fuck you." Complainant then calls out "somebody!"—and

then seems to ask someone in particular to bring her a towel, saying "it's not your fault."

Soon thereafter, complainant tells the EMS operator that she has a towel on her head, but that she thinks her ears are bleeding. When the 9-1-1 operator asks where complainant's husband is, complainant responds that he went upstairs and that his mother is there. Complainant then says something partially intelligible about "trying to get my phone back so I can call 9-1-1." Complainant says that she needs help. In response to a question from the 9-1-1 operator, complainant says that her husband is Hispanic. Complainant does not respond to questions about how tall her husband is and what he is wearing. The EMS operator asks if someone else at the house is calling 9-1-1 and complainant answers yes. The EMS operator tells complainant that the other person can hang up because they already have help on the way. Complainant seems to struggle to respond, saying she is having trouble breathing, and then repeats "I need help" several times. An unidentified woman can be heard speaking in the background, and then multiple people. The 9-1-1 operator asks if there are any weapons in the house and complainant's response is unintelligible. Complainant repeatedly asks for help and states that she needs help. M.A. can then be heard saying: "Breathe with me, breathe with me. Mom, breathe with me. Breathe!" The unidentified woman who could be heard previously speaking in the background continues to speak in the background. M.A. says:

6

"You're not going to die on me. You promise me you're not going to die on me. I need you!"

There is a knock on the front door of the residence, near where complainant is lying, then the sound of multiple people speaking and emoting at once, including the voice of the first responder who arrived first on the scene, Sheriff's Deputy Matthew McComas. Deputy McComas can be heard saying "keep pressure on it" as multiple people continue speaking and emoting at once. The EMS operator asks: "Who's there with you guys?" Deputy McComas says: "Law enforcement is on the scene." When the EMS operator asks if he knows that complainant's husband is upstairs, Deputy McComas responds that he has the husband detained. The EMS operator says "thank you," and Deputy McComas says "no problem," before the call ends.

## Business Records Affidavit

In his only issue, appellant contends that the trial court abused its discretion by admitting State Exhibit 16 into evidence because the business records affidavit on which the State relied to make the exhibit self-authenticating did not specify that it concerned State Exhibit 16 rather than the other 9-1-1 recording produced on the same day as State Exhibit 16. The State responds that the trial court did not err in admitting State Exhibit 16 and, in the alternative, that any error was harmless.

7

## A.     Standard of Review and Applicable Law

We review the trial court's decision to admit the evidence for an abuse of discretion. *Valadez v. State*, 663 S.W.3d 133, 143 (Tex. Crim. App. 2022) ("A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard."). A trial court abuses its discretion if its evidentiary ruling lies outside the zone of reasonable disagreement. *Id.* If the trial court's evidentiary ruling falls within the zone of reasonable disagreement under any applicable legal theory, we will not intervene. *De la Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009).

If the trial court abused its discretion in admitting evidence, the error does not warrant reversal unless it affected appellant's substantial rights. TEX. R. APP. P. 44.2(b); *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (stating erroneous admission of evidence is non-constitutional error that requires reversal only if it affected appellant's substantial rights). An error affects appellant's substantial rights only when the error has "a substantial and injurious effect or influence in determining the jury's verdict." *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023). After examining the record as a whole, if we have a fair assurance that the error did not influence the jury—or had but a slight effect—we will not reverse appellant's conviction. *Gonzalez*, 544 S.W.3d at 373. In reaching that conclusion, we consider: (1) the character of the alleged error and how it might

8

be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained of error. *Id*. Error in the admission of evidence may be rendered harmless when substantially the same evidence is admitted elsewhere at trial without objection. *Leday v. State*, 983 S.W.2d 713, 717-18 (Tex. Crim. App. 1998).

**B.    Analysis**

We do not reach the question of whether the trial court erred in admitting the recording of complainant's 9-1-1 call because we conclude that any error in the admission of the evidence was harmless. Appellant argues that the 9-1-1 call "introduced extremely aggravating evidence showing Complainant's statements and demeanor at the time this offense was alleged to have occurred" that "was of such a character that it served to overwhelm the jury's emotions in favor of the State." Specifically, appellant argues that the State "spent a considerable amount of time parsing through the 9-1-1 call" during its direct examination of complainant, during which testimony complainant testified "about what Appellant and Appellant's mother were doing while she was on the floor on the 9-1-1 call." Appellant argues that complainant testified about her efforts during the call to staunch the flow of blood from her head and that appellant and Gutierrez were taunting complainant in the background during the call. Appellant argues that such

9

testimony, "along with the 9-1-1, was of a very aggravating character," had a tendency to inflame the minds of jurors, and prevented them from fully considering his defense that he had used force against complainant to stop an assault of another person.

### 1. 9-1-1 call recording as evidence of complainant's injuries and appellant's actions in response

Complainant's demeanor and comments on the 9-1-1 audio recording suggest that complainant suffered an injury to her head severe enough to cause her immediate physical and emotional trauma. Complainant was crying and in an emotional state throughout most of the call, at times seemed to struggle to breathe and speak, and referenced profuse bleeding from her head and possibly ears, her inability to move from her prone position on the floor, and trouble breathing and staying awake. The recording also captures some comments from M.A., the preteen daughter who assisted complainant during the call, who appeared concerned about her mother's breathing and to fear that her mother may die.

While an unidentified man and woman, presumably appellant and his mother, Gutierrez, can be heard in the background during parts of the call, their comments are largely unintelligible with the exception of the man's stating "fuck you" at one point. That comment is not clearly a comment by appellant directed at complainant. Complainant states on the call that her husband and Gutierrez are in the house and will not help her. There is no evidence on the call that either the man

10

or the woman—who are close enough to complainant during parts of the call to be heard talking—attempted to or did help complainant during the time she was on the call.

### 2. Other evidence of complainant's injuries and appellant's actions in response

The State introduced other evidence of the severity of complainant's injuries during her 9-1-1 call and appellant and Gutierrez's reactions to those injuries. Jurors were shown, without objection, video with partial audio from Deputy McComas' body camera. That video and audio overlaps with the 9-1-1 call audio from the point Deputy McComas knocks on the front door and continues at length from the end of that call.[2] On the video, appellant tells Deputy McComas outside the house that he got in a fight with his wife, "she started hitting the kids" and he "pushed her onto the door," and she now "needs EMS." Inside the house, the video shows M.A., who is kneeling next to her mother on the floor, cry out for Deputy McComas' help, saying that her mother's "head is . . . bleeding a lot." When Deputy McComas responds that EMS is coming and M.A. should "keep pressure on it," M.A. asks if her mother is going to die. Complainant can be heard and seen crying, with what appears to be blood in her hair and on her face, on her hands and

---

[2] Some portions of the audio for the video were muted by the State, and two small portions of the video were not played to the jury based on objections by appellant. The portions of the video the jury did see and hear were admitted without objection.

11

lower and upper arms, on her legs and feet, and in spots on the floor around her head. Gutierrez is first shown opening the door for Deputy McComas, with a phone to her ear. Gutierrez does not appear to try to assist complainant. As Deputy McComas works to calm down complainant and M.A., who remain upset, Gutierrez continues talking on her phone. The phone on which complainant has been speaking to the 9-1-1 and EMS operators is shown on the floor, next to complainant's head. Deputy McComas picks it up, and says into it that "law enforcement is on the scene." Immediately after Deputy McComas states that he has detained appellant, Gutierrez is seen exiting the house and then returning through the front door.

Soon after that, Deputy McComas is shown telling another first responder that complainant is "bleeding pretty bad" from a cut on her head, but that the wound is not life-threatening. Some of his first comments to other first responders are that a Spanish speaker is needed because Gutierrez does not speak English, that Gutierrez cleaned up "the scene" and "all the blood," and that Gutierrez was apparently trying to stop complainant from calling 9-1-1. Deputy McComas later says that complainant has said that appellant hit her with a broom "after the fact."

Deputy McComas also gave trial testimony consistent with his body camera video. He noted that, when he entered the residence, complainant's "whole head was covered in blood" and resting on a towel that was "completely soaked in

12

blood." Deputy McComas noted dried blood on complainant's arms, face, neck, chest, shoulders, and legs; blood spots on the floor; and that complainant was in pain and "obviously in a state of shock" During Deputy McComas' testimony, the jury was also shown photos of the crime scene, without objection.

Another first responder, Sheriff's Deputy Christina Haggard, testified that, upon her arrival, complainant was "very upset," "crying," and "had fear in her voice," which was "trembling." When asked if complainant looked as if she could get up and walk around, Deputy Haggard responded "no." M.A. was "chaotic with her because she was so scared," and "very upset, very concerned about her mom and the events she had seen." From the state of complainant, the floor, and the mop, Deputy Haggard believed blood had been cleaned up. During Deputy Haggard's testimony, the jury was shown photographs of complainant's injuries, without objection. Deputy Haggard pointed out places in the photographs showing that complainant's face was starting to swell and bruise, and testified that what she saw in the photographs was consistent with someone who has been struck in the face.

Complainant testified at trial. According to complainant: Appellant struck her in the face, with his fist, in front of Gutierrez. Gutierrez then took complainant's two younger children, complainant's purse, and complainant's phone to another room, leaving M.A. with her mother in the foyer. Appellant then

13

began "hitting [complainant] nonstop," while cursing and calling her names. Appellant struck complainant 20 to 25 times. When complainant told appellant he was hurting her, appellant responded that he did not care. Complainant felt "a lot" of blood coming from her head and also felt dizzy. She began shaking and fell on the floor. Appellant grabbed a mop, began cleaning up complainant's blood, and struck complainant with the mop seven to 10 times. At no point did appellant try to help complainant. Complainant was unable to get up from the floor, and asked M.A. to try and get complainant's phone. At that point, appellant and Gutierrez were in the same room with complainant, "discussing what they want to do with" complainant. M.A. was able to get complainant's phone, dialed 9-1-1, and put the phone on speaker next to complainant. When EMS put complainant on a stretcher, the pain was a 10 on a scale from 1 to 10, "with nausea."

Although complainant's 9-1-1 call was played for the jury during complainant's testimony, and complainant was asked some questions on the stand at points when the recording was paused, complainant did not testify that appellant and Gutierrez were "taunting her" while she was on the call. Complainant testified that, at one point during the call, appellant was cleaning blood around her and Gutierrez was calling 9-1-1. Complainant testified that, when appellant can be

14

heard saying "fuck you," he was saying it to her.[3] She was asked if she knew what appellant was doing when he went upstairs, and she said she did not.

During complainant's testimony, her medical records were admitted without objection. The medical records noted complainant reported being punched and being "kicked and stomped" while on the floor. The records show the six skin staples required for her head wound, and document abdominal pain, a facial contusion, pain in her left hand, and an "abundance of abrasions and bruises."

In her testimony, Gutierrez admitted to not having assisted complainant while complainant was lying injured on the floor—other than, Gutierrez claimed, handing complainant's phone to complainant—and to mopping up complainant's blood "[a] little" while complainant was speaking to 9-1-1, and before Gutierrez herself called 9-1-1.

### 3. Additional evidence of appellant's guilt

Beyond that already discussed, additional record evidence independent of the 9-1-1 call supported the jury's guilty verdict. Appellant's defense was that he intervened while complainant was beating M.A., in defense of M.A., and inadvertently pushed complainant into a door hinge. However, there was no evidence of any injury to M.A., and Deputy McComas found no blood on the door hinge. The State presented evidence of injuries to complainant that went beyond

---

[3] During his cross-examination of appellant, the State's counsel called attention multiple times to appellant's "fuck you" comment to complainant.

15

her head laceration, including Deputy Haggard's testimony that the photographs of complainant showed injuries consistent with her having been struck in the face. Moreover, independent of the 9-1-1 call, the jury heard evidence that it could reasonably have interpreted as evidence that appellant and Gutierrez tampered with evidence and otherwise sought to impede a police investigation of the incident. The jury heard evidence that Gutierrez had attempted to prevent complainant from calling 9-1-1, that Gutierrez and appellant had "cleaned up" blood in the area where complainant fell, and that appellant had gone upstairs during the 9-1-1 call to shower.

The complained-of portions and elements of the 9-1-1 call and complainant's testimony about the call were duplicative of other evidence presented to the jury, without objection. That evidence included, as noted, footage from Deputy McComas' body camera, Deputy McComas' testimony, crime scene photos, Deputy Haggard's testimony, photos of complainant's injuries, complainant's other testimony, complainant's medical records, and Gutierrez's testimony. In addition, the state of the evidence independent of the 9-1-1 call provided solid support for the jury's guilty verdict, undermining appellant's argument that it was the 9-1-1 call that led the jury to reject his defense that he had used force against complainant to stop her from harming M.A.

Based on the record as a whole, we thus conclude that any error in the admission of the 9-1-1 call recording was harmless (1) given the introduction of evidence that substantially duplicated the complained-of portions and elements of the 9-1-1 call and complainant's testimony about the call, *see Leday*, 983 S.W.2d at 713 (error in admission of evidence may be rendered harmless if substantially same evidence is admitted elsewhere without objection); *see also Cochran v. State*, No. 02-23-00034-CR, 2023 WL 7037625, at *2 (Tex. App.—Fort Worth Oct. 26, 2023, no pet.) (mem. op., not designated for publication) (holding that any error in admission of 9-1-1 call recording was harmless because call was cumulative of other properly admitted evidence, including testimony and body-camera footage); and (2) because the admission of the recording of the 9-1-1 call did not have a substantial and injurious effect or influence in determining the jury's verdict, *see Cook*, 665 S.W.3d at 599 (stating that error in admission of evidence affects appellant's substantial rights only if it has a substantial and injurious effect or influence in determining jury's verdict); *see also Rodriguez v. State*, 491 S.W.3d 18, 35 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (holding that any error in admission of recording of 9-1-1 call was harmless because appellant had not shown how admission of call had substantial and injurious effect or influence in determining jury's verdict).

We overrule appellant's only issue.

## Conclusion

We affirm the judgment of the trial court.

Amparo "Amy" Guerra
Justice

Panel consists of Justices Guerra, Guiney, and Johnson.

Do not publish. TEX. R. APP. P. 47.2(b).