Opinion issued January 15, 2026



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-24-00680-CR

—————————————

**SIMON ADAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 248th District Court
Harris County, Texas
Trial Court Case No. 1759093

## MEMORANDUM OPINION

Appellant Simon Adams was convicted of murder and sentenced to thirty years' confinement in prison. He challenges his conviction in two issues. We affirm.

## Background

On the afternoon of January 20, 2022, appellant and Nicholas Croom were involved in a road-rage incident on the feeder road of the Beltway in Harris County. Appellant was driving a pickup truck, and Croom was driving a sedan. Various accounts of the incident were provided at trial.

The first eyewitness, Joe Leyva, testified that on January 20, 2022, while he was driving on Mesa Drive, he saw a car and pickup truck driving fast like they were racing. Leyva drove behind these vehicles on the Beltway feeder road and realized the drivers of the car and truck "were arguing with each other, yelling," but he did not hear what they were saying. Leyva observed the truck appear to run the car off the road "and then that's when [he] heard four consecutive shots." Per Leyva, the driver of the car must have then been incapacitated, because the car "went across three lanes of traffic," slammed into a wall or curb, and then rolled back across the lanes. Leyva's 911 call was admitted into evidence. On the call, Leyva stated that the drivers of the car and truck were yelling at each other and aggressively driving near each other.

The second eyewitness, John Allen, testified that on January 20, 2022, he drove up to the red light at Mesa Drive and the Beltway intersection, he pulled behind a truck in the far right lane, and a car was to the left of the truck. Allen thought the drivers of these vehicles may have already been "into it" because the

2

truck was "trying to get over possibly." Per Allen, both vehicles had their windows rolled up at this point. When the light turned green, neither vehicle immediately took off, and the car then drove in front of the truck, the truck moved over to the lane to the left, and both vehicles slowed down, at which point Allen heard gunshots. Allen did not see either vehicle try to hit the other, but he did tell police that the car "brake checked" the truck twice. After the shots, Allen saw the car hit the curb, go across the three lanes toward the Beltway, and then come back to the far right lane and stop. Allen's 911 call was admitted into evidence. On the call, Allen stated he was reporting a "road rage accident" during which someone was shot. Allen said the car got in front of the truck and stopped, and the truck then got on the side of the car and started shooting, firing four or five shots.

Allen videorecorded around twelve seconds of the incident with his phone. The recording shows the vehicles driving on the Beltway feeder road, with the car in the right lane and the truck in the middle lane next to the car. The car brake lights come on, the truck taps its brakes while shots can be heard, the car veers toward the truck, and the truck taps its brakes and appears to swerve left to avoid the car. The car then goes left over the right-hand curb with its right-side tires and then drifts left across the lanes.

Appellant testified at trial as follows. On January 20, 2022, he was driving home after a twelve-hour work shift and going about sixty to seventy miles per hour

3

on the freeway when a car pulled into appellant's lane and slammed on the brakes, causing appellant to slow to fifteen miles per hour. Appellant had not seen or encountered the car before. When appellant attempted to go around the car, it drove into appellant's lane again, still going fifteen miles per hour. Appellant tried to fool the car driver by exiting the freeway "at the last minute" at the Mesa Drive exit, but the car followed behind. Appellant came to a stop at a traffic light in the far right lane at the Mesa Drive stoplight, and the car pulled beside appellant to the left. The car had its window down and the car driver appeared to be angry and said "angry words." The car driver then got out of his car with his hands inside a black bag and said he was going to shoot appellant. Appellant's window was down and his gun was in his hand at that time, but he did not shoot the driver because appellant "was waiting on [the driver] to make a move or see what he was going to do." Appellant asked the driver if he knew appellant "from somewhere."

Appellant testified that, when the light turned green and the other cars started driving, the car driver "hurrie[d]" and "jumped back in his car," drove in front of appellant, and slammed the car's brakes. Appellant drove into the left lane to go around the car, but the car switched to that lane going seven-to-eight miles per hour. The car driver was looking at appellant and said he would "leave me right here, and that I wouldn't make it home, and he was following me -- me to the house and telling me what gang he was from." At this point appellant was scared, and believed he

4

was in danger and the car driver had a gun, so appellant fired shots "to get [the driver] away from me." Appellant did not look at the car driver when he shot but ducked on the side of his steering wheel and fired without aiming, at which point he swerved. Appellant ducked because he believed the driver was going to shoot him.

Appellant testified he was scared and nervous after the shooting and believed someone must have seen him do the shooting because it was "broad day" with "a lot of people around." Appellant knew that he would eventually have to answer for this shooting. Appellant did not call 911 because he was not aware he had shot or killed the car driver, although he admitted he learned from the news a few days afterward that the driver had been killed. Appellant continued to go to work in order to make money to afford a lawyer so he could turn himself in. Appellant did not dispose of his gun.

Appellant was arrested on February 15, 2022, after police learned of his identity and that they could find him at his place of work. Police arrested appellant as he was leaving work in his truck. Police found a pistol in the truck. Forensics showed that the pistol fired two bullets recovered from the decedent's body. The parties stipulated at trial that the decedent, and complainant in this lawsuit, is Croom.

On February 16, 2022, appellant called his mother from jail, and a recording of the call was admitted at trial. On the call, appellant's mother stated that appellant could claim the police have the wrong truck, and appellant said he could "play that

role" except that police found the pistol in the truck. Appellant said he believes "Francesca" told the police about his involvement, and his mother became angry with him for telling Francesca. Appellant says he told Francesa because the shooting was fresh, "this was unexpected," he "didn't have no intent on doing this," and he was "shook up too." Appellant also stated at one point, "[T]his nigga did this, like I ain't lying to you," and his mother said she believes him. However, appellant made no audible statement on the call that he acted in self-defense nor say anything about the threats he alleges Croom made.

Police found a black backpack and a knife in Croom's car but no other weapons, including no firearm.

A substitute medical examiner testified that an autopsy was performed on Croom's body and that his cause of death was gunshot wounds to his head and torso. The trial court admitted Croom's autopsy photographs over appellant's objection that the substitute medical examiner lacks personal knowledge to authenticate the photographs. The substitute medical examiner then described the gunshot wounds reflected in the photographs.

A jury convicted appellant of murder by shooting Croom with a deadly weapon, a firearm, and sentenced appellant to thirty years' confinement. Appellant now appeals.

6

**Analysis**

**I.     The evidence is legally sufficient to support the *mens rea* element of murder**

In his first issue, appellant contends the evidence is legally insufficienct to support the *mens rea* element of murder because "the only evidence presented at trial was that Adams intended to evade Croom's aggressions."

Evidence is legally sufficient to support a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023). In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the verdict without substituting our judgment for that of the jury. *McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023); *Dunham*, 666 S.W.3d at 482. The jury is the sole judge of the credibility and weight to be attached to witnesses' testimony. *Dunham*, 666 S.W.3d at 482. "The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all the evidence or testimony proffered, and weigh the evidence as it sees fit." *Mottin v. State*, 634 S.W.3d 761, 765 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd).

The jury charge provided two theories under which the jury could convict appellant of the offense of murder: (1) he intentionally or knowingly caused Croom's death by shooting him with a deadly weapon, a firearm; or (2) he intentionally caused

7

serious bodily injury and intentionally or knowingly committed an act clearly dangerous to human life by shooting Croom with a deadly weapon, a firearm, causing Croom's death. *See* TEX. PENAL CODE § 19.02(b)(1)–(2).[1] Murder is a "result of conduct" offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death. *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE § 6.03(a). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

Direct evidence of intent is not required, as it is usually gleaned from circumstantial evidence. *See Reyes v. State*, 480 S.W.3d 70, 77 (Tex. App.—Fort Worth 2015, pet. ref'd). One's actions are generally reliable circumstantial evidence of one's intentions. *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009). When a person fires a deadly weapon at close range and death results, the law presumes an intent to kill. *Wharton v. State*, 711 S.W.3d 92, 102 (Tex. App.—Houston [1st Dist.] 2024, pet. ref'd).

---

[1] The charge also included instructions regarding self-defense, instructing the jury to find appellant not guilty unless it found beyond a reasonable doubt that he did not act in self-defense.

The evidence supports that Adams lined his truck up with Croom's car and fired a pistol multiple times at Croom's car, shooting him in the head and torso. A rational jury could find that Adams did not merely fire warning shots but fired mutliple shots *at* Croom, acting with knowledge that such conduct was reasonably certain to cause Croom's death. *See* TEX. PENAL CODE §§ 6.03(b), 19.02(b)(2). The jury could disbelieve appellant's testimony that he was ducked down, hiding behind his steering wheel and shooting with the sole intent to get Croom away from him, especially because (1) Allen's recording of the shooting shows that appellant braked and swerved during the shooting to avoid Croom's car which was coming into appellant's lane, (2) appellant did not call the police to explain the shooting was in self-defense even after learning about Croom's death but was arrested weeks later, and (3) appellant did not express that he acted in self-defense on the jail call with his mother. *See Ramirez v. State*, 229 S.W.3d 725, 730 (Tex. App—San Antonio 2007, no pet.) ("When a defendant's version of the facts conflict[s] with other witnesses' testimony or other evidence, it is the jury's prerogative to draw reasonable inferences from the evidence, and to judge the credibility of the witnesses and the weight to be given their testimony."); *see also Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989) ("Evidence of flight is admissible as a circumstance from which an inference of guilt may be drawn."); *Haye v. State*, No. 01-15-01057-CR, 2017 WL 444462, at *4 (Tex. App.—Houston [1st Dist.] Feb. 2, 2017, pet. ref'd) (mem. op.,

not designated for publication) (flight from scene after shooting constituted evidence jury could consider in rejecting self-defense claim).

Appellant relies on *Sloan v. State*, in which the Court of Criminal Appeals concluded the evidence did not support the appellant's conviction of assault with intent to murder because, if the appellant intended to take the complainant's life, he "could have easily done so" but did not. 76 S.W. 922, 922–23 (Tex. Crim. App. 1903). He also relies on *Robinson v. State*, in which the Court of Criminal Appeals concluded the evidence did not support the appellant's conviction of assault with intent to murder because the mere fact that the appellant inflicted a non-serious, shallow cut on the complainant's throat was insufficient to show the appellant intended to kill the complainant. 356 S.W.2d 929, 929–31 (1962). We conclude these cases are distinguishable because, here, appellant did not simply do something dangerous that could have seriously injured Croom but actually killed Croom by shooting him multiple times after lining his truck up with Croom's car.

Accordingly, reviewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found the *mens rea* element of murder beyond a reasonable doubt. *See Dunham*, 666 S.W.3d at 482. We overrule appellant's first issue.

**II.	Admission of the autopsy photographs did not harm appellant**

In his second issue, appellant contends that photographs of Croom's autopsy were improperly admitted because they were not properly authenticated by the substitute medical examiner who testified in place of the medical examiner who performed the autopsy. However, even if the admission of these photographs was erroneous, it was harmless.

If the trial court abused its discretion in admitting the evidence, the error does not warrant reversal unless it affected appellant's substantial rights. TEX. R. APP. P. 44.2(b); *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (stating erroneous admission of evidence is non-constitutional error that requires reversal only if it affected appellant's substantial rights). An error affects appellant's substantial rights only when the error has "a substantial and injurious effect or influence in determining the jury's verdict." *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023). After examining the record as a whole, if we have fair assurance that the error did not influence the jury—or had but a slight effect—we will not reverse appellant's conviction. *Gonzalez*, 544 S.W.3d at 373. In making that determination, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained of error. *Id.* Neither

party has the burden to show harm; instead, the reviewing court assesses harm by examining the record as a whole. *Loch v. State*, 621 S.W.3d 279, 282 (Tex. Crim. App. 2021); *Werner v. State*, 412 S.W.3d 542, 547 (Tex. Crim. App. 2013).

The photographs show the gunshot wounds to Croom's body. After the photographs were admitted, the substitute medical examiner used the photographs to explain that Croom sustained two shots to the left side of his face, one of which resulted in the bullet exiting the right side of his face, and the other of which resulted in the bullet being lodged in Croom's head. During closing arguments, the prosecutor argued evidence that Croom was shot in the left side of his head negated appellant's testimony that Croom was looking at him at the time of the shooting and that appellant was not aiming when he fired the shots:

> And on top of that, the most outrageous lie that this man told you on the stand is that the victim was looking at him when he had to shoot him. He was looking at him? How -- how did you hit him right there (indicating) if he was looking at you? Then he wants to tell you that he ducked across the steering wheel, he ducked down (demonstrating), and then, obviously, with his right hand -- 'cause where the car is -- just starts shooting. And he hit him that close? There are police officers that I know that can't hit this shot, and he hit him that close twice in a row? And he ducked down to shoot him? Come on. It's just another part of this story that he wants to make up --

The prosecutor's emphasis on where the shots struck Croom per the autopsy photographs weighs in favor of harm. However, there are signficant factors that contradict appellant's self-defense theory and weigh against harm.

12

The substitute medical examiner testified without objection and before the photgraphs were admitted that Croom's cause of death was gunshot wounds to his head and torso. During closing argument, the prosecutor explained that multiple pieces of evidence—in addition to the gunshots on the left side of Croom's face—combine to establish beyond a reasonable doubt that appellant did not act in self-defense, including: (1) that appellant never called the police to tell them he shot Croom in self-defense, even though appellant had known for around three weeks that he killed Croom before being arrested; (2) eyewitness Allen was stopped behind appellant and Croom at the Mesa Drive intersection but never mentioned "a single person getting out of the car," meaning appellant's story that Croom got of the car, threatened to shoot appellant, then hurried and got back into the car when the light turned green was fabricated; (3) appellant lied when he testified the incident occurred in "broad day" because the video proves it was dark when it occurred; (4) Allen's videorecording showing that appellant slowed down right before he fired the shots was indicative of appellant "lining up his shot" (in fact, Allen's videorecording shows appellant braked and swerved while the shots were being fired to avoid Croom's car which swerved into appellant's lane, supporting that appellant was looking at Croom's car while shooting); and (5) during the jail call, when appellant's mother suggested that appellant could claim the police have the wrong truck, appellant said he could "play that role" except that police found the pistol in the

13

truck, and appellant did not affirmatively state on the call that he acted in self-defense due to Croom's alleged threats to shoot appellant.

The jury could have readily determined that (1) if Croom were outside his car at the instersection, Allen would have testified as such, (2) appellant lined his truck up with Croom's car in order to shoot him and was paying attention as he fired the shots, (3) appellant had no intention of contacting police to inform them he acted in self-defense, and (4) if appellant acted in self-defense, he would have affirmatively asserted such on the jail call with his mother when discussing his options. In light of these factors, we conclude that any harm stemming from the admission of the photographs was slight and did not have a substantial and injurious effect or influence in determining the jury's verdict, and more speficially, its rejection of appellant's self-defense claim. *See Cook*, 665 S.W.3d at 599; *Gonzalez*, 544 S.W.3d at 373. We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Andrew Johnson
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Johnson.

Do not publish. TEX. R. APP. P. 47.2(b).