

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00239-CR

_____

PAUL LEE GOOD, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1336150

---

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Paul Lee Good appeals his convictions for aggravated sexual assault of a child and indecency with a child by contact of his stepson, Pete.[1]  *See* Tex. Penal Code Ann. §§ 21.11(a)(1), 22.021(a)(1)(B)(i), (iii), (v).  At trial, over Good's objection, the State was allowed to introduce evidence of Good's having committed extraneous offenses and other sexual acts involving children besides Pete.  Some of these extraneous acts allegedly took place in states other than Texas, and in one case, Good was convicted of the offense of indecent behavior with a juvenile—his daughter Farah—in Louisiana.

On appeal, Good raises only one issue: that the trial court reversibly erred by admitting evidence of the out-of-state conviction for indecent behavior with a juvenile to prove character conformity pursuant to Article 38.37 of the Texas Code of Criminal Procedure.[2]  *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 2(b).  Because we

---

[1]To protect the complainant's identity, *see* Tex. R. App. P. 9.10(a)(3), we refer to him and his family members—except for Good—by pseudonyms.

[2]Good phrases his sole appellate issue as, "The trial court reversibly erred in admitting evidence and testimony pertaining to out-of-state extraneous offenses under Article 38.37 of the Texas Code of Criminal Procedure."  But in the argument and summary of the argument sections of his brief, *see* Tex. R. App. P. 38.1(h), (i), he complains only about the admission of the Louisiana conviction under Article 38.37.

hold that any error Good raises was harmless, we overrule his issue and affirm the trial court's judgments.[3]

## I. BACKGROUND

Good does not challenge the sufficiency of the evidence to support his convictions. To inform our harm analysis, however, we provide a summary of the evidence at trial.

## A. Pretrial Investigation

Although the exact timeline of events leading up to the charges against Good in the present case are not clear from the record, it is apparent that in 2012, Good's then wife, Mary, decided to separate from him. In 2013, Farah made an outcry to Mary, who reported it to the police. Michael Weber, at the time an investigator at the Tarrant County District Attorney's Office, was assigned to work on the case. During his investigation, Weber interviewed Pete, who revealed that he too had sexually abused Farah but also claimed that he had been sexually abused by his older stepbrothers[4] and, on one occasion, by Good. The District Attorney's Office decided to treat Pete as a victim rather than a perpetrator. They did not pursue charges

---

[3]Although Good was charged, convicted, and sentenced under one cause number, the trial court entered a separate judgment for each count.

[4]Good and Mary had two biological children—Farah and Stephen—together. Before Farah and Stephen were born, Good and Mary adopted Mary's sister's children: Jordan, Stewart, and Ellie. Before his marriage to Mary, Good had been married to Pete's biological mother. Pete is younger than Jordan, Stewart, and Ellie but older than Farah and Stephen.

3

against Pete for sexual abuse of Farah but instead obtained arrest warrants for Good related to the allegations of sexual assault of Pete.

A grand jury later indicted Good on two counts of aggravated sexual assault of a child, one count of attempted aggravated sexual assault of a child, and two counts of indecency with a child by contact for his alleged sexual abuse of Pete. Prior to trial, the State waived the attempted aggravated sexual assault count.

## B. Pete's Testimony at Trial

At trial, Pete testified that he was physically abused as a child. He explained that, if he got a bad grade in school, then he "typically got whooped or something like that." Pete testified to one specific occasion when Good had checked his binder when he came home from school and noticed that Pete had a bad grade. Good took him to their bedroom[5] in the very back of the house, sat Pete on the bed, and "gave [him] an ultimatum, that [they] c[ould] either do it the hard way and [Pete] c[ould] get [his] ass beat, or [they] c[ould] do it another[,] easier way." Pete chose "the easier way because [he] didn't want to get beat[en]."

According to Pete's testimony, Good then "left the room . . . and . . . came back with something" that Pete identified as lubricant. At Good's instruction, they both fully undressed. Good then asked Pete to perform oral sex on him. At first Pete "didn't feel comfortable with it," so Good then "proceeded to demonstrate on" Pete

---

[5]Pete explained that, at the time, he, Good and Mary were living with Good's stepfather. Good, Mary, and Pete shared a bedroom in the "very back" of the house.

4

by grabbing Pete's penis and putting his mouth on it. Good "then asked [Pete] to do it" to him and "had [Pete] lean forward and put [his] mouth on" Good's penis, but Pete did not like this and got up. Good then "put on a small thing of lubricant[,] and then he put [Pete] on top of him," facing away from him and penetrated his anus.[6] Pete recalled at trial that this "hurt" and that he "was complaining that it was hurting." After Good finished, he told Pete "not to tell anybody and that it was a secret between" them. Pete testified that after this, nothing else happened sexually between the two of them but that the physical abuse continued.

Pete testified that he was later sexually abused by Stewart and Jordan and that Stewart was his primary abuser.[7] Pete recounted that Good had "caught" him and Stewart on one occasion. According to Pete, Good "asked [them] what happened individually" and then told them that "everything was okay and it was perfectly normal."

Finally, Pete testified that after being sexually abused by Good, Jordan, and Stewart, he had engaged in sexual contact with Farah, who was ten years his junior, "[a]bout two or three times." He could not remember how old Farah was when he had this sexual contact with her but testified that "[s]he was walking and talking at the

---

[6]While Pete did not expressly testify that Good penetrated his anus, in response to the State's question, "Does he say anything to you before he penetrates your anus?" Pete testified, "He -- he said something. I just don't remember exactly what he said."

[7]He testified that Jordan had abused him "three times in Fort Worth" and that Stewart's abuse continued until Stewart left the house.

time."[8]

## C.      Evidence of Good's Extraneous Offenses and Other Acts

At a hearing outside the jury's presence, the trial court heard testimony from three witnesses and received exhibits pertaining to Good's extraneous conduct. The first of the three witnesses to testify at the hearing was Corporal Abbas Safdar with the Tarrant County Sheriff's Office. The State used him to authenticate Good's Louisiana conviction for indecent behavior with a juvenile.

Farah, 21 years old by the time of trial, was the next witness, and she provided copious testimony related to extraneous offenses that Good had committed against her. According to Farah, she was "[a]bout five" years old when Good started sexually abusing her. She remembered sitting alone on the couch and watching TV in Good's master bedroom and looking over at Good, who "ha[d] this look on his face." She related that at the time she was "sucking on [a] lollipop," and Good then "pull[ed] out his cock" and told her "to suck it," but when Pete walked into the room, Good "quickly cover[ed] it up." Once Pete left the room, though, she proceeded to "[p]erform oral" by putting her mouth on his penis.

Farah testified that this became a frequent occurrence and that Good made her perform oral sex on him until she was around nine or ten years old. She also recalled

---

[8]He admitted that he had lied to Weber about sexually abusing Farah, first by denying it altogether and then by telling him that it was only one time. Pete stated that he was aware that what he did to Farah would have been considered aggravated sexual assault of a child.

6

him once "performing anal," clarifying that his penis went inside her anus. She described being on her hands and knees and "just waiting for it to be over." Additionally, Farah testified that Good would touch her vagina with his hands and put his mouth on her vagina and perform oral sex on her. She thought that this was normal behavior and said that it got to a point where she started "instigating the situation."

Farah also related that Good had made her watch porn with him "multiple times." According to Farah, she "would just walk into his bedroom, he would have [her] sit on his lap, and he would pull up porn. Sometimes it was adults on the videos. Sometimes it was kids on kids or kids on older men. And [during this time] he would have [her] spread . . . [her] legs and would rub" her.

Farah testified that Good sexually abused her in Texas, Louisiana, and Arkansas, but Farah had difficulty remembering which acts occurred in which state. She testified that "maybe the lollipop part" happened in Texas but that they had "moved from Texas to Louisiana, back to Texas, and back to Louisiana a lot and -- back to -- Texas, Louisiana, back to Texas, and then [to] Arkansas."

The final witness at the hearing Kaitlyn—the daughter of Mary's best friend— also provided abundant testimony regarding extraneous conduct on Good's part. Kaitlyn, who was 32 years old at the time of trial, testified that there were "numerous" times when she was a child that Good did or said something inappropriate with or around her. For example, she said that when she was about five or six, he would walk

7

around without his shirt on at the house and ask her if it made her feel uncomfortable. She also said that there were times where she did not want to go outside to play because it was hot, and "so the deal was that if [she] would sit in his lap, [then she] didn't have to go outside and play." She estimated that she probably sat in his lap "between 10 and 20" times before she stopped going over to that house.

Kaitlyn recalled another instance when she was about six years old when Good saw her "sitting under a blanket with a male family friend around [her] age." She said that afterwards Good had told her mother what he had seen and that she had gotten in trouble. According to Kaitlyn, Good later told her "that he had done that because he was jealous of the little boy."

Kaitlyn also testified that after both families had moved to Florida and were living together,[9] Good had had her sit in his lap and shown her "orgy porn." She said that she was in third grade at that time and "got really freaked out." She further testified that on about six occasions, when she was around "eight or nine" he would make her change clothes in front of him.

Kaitlyn also testified that at the same home in Florida, she would get up in the middle of the night and use the bathroom, "and [Good] would tell [her] the next day

---

[9]While the details of their housing situation were not made clear at the hearing, when Kaitlyn later testified before the jury, she explained how her family and Good's family moved to Florida and wound up living together because Good and Mary "couldn't find jobs." She testified that in Florida, she and her mother and brother shared a three-bedroom townhome with Good, Mary, and Pete.

that he [had] heard [her] going to the bathroom and that he [had] thought about [her] while [he] and [Mary] were having sex." Kaitlyn further testified that there was a hole in the master bedroom closet, "almost like a safe had been there," and he had told her that he wanted her "to climb in there and listen to him and [Mary] have sex."

Kaitlyn then testified to one incident when he had fondled her in a car:

> We had been at the beach all day in Clearwater. We were going home. My mom was driving. [Mary] was in the passenger [seat]. [Good] was behind [Mary], then me, then the two boys. I had a romper on[,] and it had buttons down the front. And we had changed out of our bathing suits, so I didn't have anything on underneath. And I woke up[10] and the romper was completely unbuttoned[,] and his hands were on my vagina.

She clarified that Good had made "skin-to-skin contact" with "the outside of [her] vagina and labia." As she explained, "the entire time [that they] were in Florida, he was creepy."

Finally, Kaitlyn testified that after they had moved back to Texas, at the same house where Pete alleged Good had sexually abused him, Good "somehow pinned [her] down to the bed [in the room where she was supposed to sleep] and rubbed himself . . . on [her] lower half."

At the conclusion of the hearing, Good objected to the admission of his Louisiana conviction, all of Farah's testimony except "the one potential lollipop incident that might have happened in Texas where she described oral sex," and all of

---

[10]Kaitlyn later explained at trial that she had fallen asleep after having been at the beach all day.

Kaitlyn's testimony except "the incident . . . where he rubbed himself against her," which allegedly occurred in Texas. The trial court ruled all three witnesses' testimony admissible under Article 38.37, *see* Tex. Code Crim. Proc. Ann. art 38.37, § 2(b), and gave Good a running objection. Thereafter, Corporal Safdar, Farah, and Kaitlyn provided essentially the same testimony in the jury's presence.

## D. Mary's Testimony at Trial

At trial, Mary testified that she married Good in 1998. They adopted Jordan, Stewart, and Ellie, who were her sister's children, in 2003. Then they had Farah and, a few years later, Stephen. She confirmed that Pete got in trouble at school a lot and that Good was physically abusive to him "[a]t times."

Mary related that she and Good "got in a fight" regarding infidelity in 2012 and that she left him. A year later, Farah told her that Good had been sexually abusing her, and Mary confronted Good via text message about the allegations. Redacted copies of Mary and Good's text message exchange from 2013 were admitted into evidence. In those text messages, Mary made graphic, accusatory statements regarding Farah's allegations, and Good responded with tacit admissions and apologies.[11]

---

[11]In one of his texts to Mary, Good said, "I don't recall any of that," but elsewhere in the same exchange, he made inculpatory statements in response to the accusations. For example, in response to Mary's text mentioning Farah by name and asking him "why did u do it," Good texted simply, "I did." Elsewhere in the exchange, Good responded to Mary's accusations and questions about the alleged abuse by stating that he had "stopped."

After texting with Good, Mary met with Weber. In Weber's presence, Mary called Good on her phone. An audio recording of that phone call was admitted into evidence, and a redacted version was played for the jury. In that recording, Good admitted to sexually molesting Farah multiple times in Arkansas but denied having molested Pete.

## II. ANALYSIS

Central to Good's lone appellate issue is the purpose for which the State wanted his Louisiana conviction admitted into evidence: to prove that Good acted in conformity with his bad character. Texas Rule of Evidence 404(b)(1) provides that evidence of an extraneous crime, wrong, or other act is not admissible for this purpose. Tex. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). But Article 38.37 of the Texas Code of Criminal Procedure provides an exception to this rule in cases involving sexual or assaultive offenses alleged to have been committed against minors:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, . . .
> evidence that the defendant has committed a separate offense described
> by Subsection (a)(1) or (2)[12] may be admitted in the trial of an alleged

---

[12]Subsection 2(a) of the statute makes Subsection 2(b) applicable only to the trial of a defendant for (1) an offense, including indecency with a child and aggravated sexual assault of a child, under any of certain listed provisions of the Texas Penal Code that criminalize sexual conduct involving a child or children or (2) "an attempt or conspiracy to commit" such an offense. Tex. Code Crim. Proc. Ann. art. 38.37, § 2(a).

11

offense described by Subsection (a)(1) or (2) for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.

Tex. Code Crim. Proc. Ann. art. 38.37, § 2(b).

To support his argument that "the very text of Article 38.37 specifically excludes the admission of foreign convictions under Article 38.37," Good references Texas's other statutes that contain clauses allowing the use of convictions from other states only if they are "substantially similar" to the listed Texas offenses, *see* Tex. Penal Code Ann. § 12.42(c)(2)(B)(v); Tex. Code Crim. Proc. Ann. art. 62.003(a), and points out that Article 38.37 does not contain a similar clause. Good thus contends that because the Louisiana statute under which he was convicted is not specifically listed in Subsection 2(a)(1) or (2) of Article 38.37, his conviction was not admissible. *See* Tex. Code Crim. Proc. Ann. art. 38.37, § (2)(a)(1), (2).

But even assuming that the trial court erred by admitting Good's Louisiana conviction for character-conformity purposes under Article 38.37, we are not persuaded that any such error is reversible.

---

Subsection 2(a) has been amended since Good's trial. Act of May 23, 2025, 89th Leg., R.S., ch. 806, S.B. 1212, §§ 4, 6, art. 38.37 (codified at Tex. Code Crim. Proc. Ann. art. 38.37, § 2(a)). Because our analysis is confined to whether Good was harmed by the admission of his extraneous conviction for character-conformity purposes, we need not discuss the changes to the statute.

12

Because the error complained of here is not constitutional,[13] we apply Rule 44.2(b).[14]   Tex. R. App. P. 44.2(b).   That Rule requires us to disregard any nonconstitutional error that does not affect Good's substantial rights.  *Id.*   A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. U.S.*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).  Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect.  *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence

---

[13]Generally, the erroneous admission or exclusion of evidence is nonconstitutional error governed by Rule 44.2(b) if the trial court's ruling merely offends the rules of evidence.  *See Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *see also Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). Because Good contends that Article 38.37 does not allow for admissibility of the Louisiana conviction, his argument boils down to whether this evidence violates Rule 404(b)(1).

[14]Good concedes that the "appropriate harm analysis is . . . the one set out in Texas Rule of Appellate Procedure 44.2(b)."  *See* Tex. R. App. P. 44.2(b).  The State does not provide a harm analysis, but under Rule 44.2(b) (nonconstitutional error), neither the defendant nor the State has the burden to prove harm or harmlessness as to whether the appellant's substantial rights were affected; rather, the reviewing court has the duty to assess harm by independently examining the record as a whole.  *Loch v. State*, 621 S.W.3d 279, 282 (Tex. Crim. App. 2021).

13

supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

Looking at the other evidence admitted at trial, it is difficult to conceive that Good's Louisiana conviction made the difference between the jury convicting him or acquitting him on even one of the counts. The jury heard graphic testimony from Farah and Kaitlyn that Good had performed multiple different sexual acts on them when they were children and—in Farah's case—had made her perform oral sex on him, her own father.

The jury also heard on the recorded phone call that:

- Good admitted to Mary that he had instructed Farah to put his penis in her mouth and that she had performed oral sex on him and touched his penis.[15]

- Farah was "around seven" when this happened, and Good had "fooled around" with her "every so often."

- Good admitted to rubbing her in her crotch and rubbing his penis "on her anal

---

[15]Good objected at trial to the audio recording of the phone call but does not complain about its admission on appeal.

14

[sic]."

- Good admitted to putting his "finger in her butthole" one time and that Farah had caught him looking at pornography multiple times.[16]

- Good admitted to an incident in Arkansas in which he was asleep in bed with his "underwear down" and, after having awoken to discover Farah playing with his penis, he then "touched" Farah and "licked her."

- Mary repeated Farah's allegations of Good sexually abusing her in graphic detail.

- Good admitted to looking at child pornography and that he and Pete "got naked, and that's about it."

- Good alluded to having sex with Jordan.

Thus, from the phone conversation alone the jury not only heard evidence of Good's Louisiana conviction for indecent behavior with Farah but also heard extensive details about his other extraneous conduct. In light of this and other evidence, it is unlikely that the Louisiana conviction had a substantial and injurious effect or influence in determining the jury's guilty verdict.

Pete's testimony at trial must also be considered. The State's case against Good hinged on Pete's credibility. And although Pete's testimony was the only direct

---

[16]On the recording, Mary can be heard asking Good, "And . . . every time she caught you with it, did you fool around with her?" Good's immediate response was, "Not every time, no."

15

evidence the State had proving the charged offenses and no physical evidence corroborated his allegations that Good had sexually assaulted him, Good's only attempts to impeach Pete—using a letter that Pete had purportedly written to Good—were thwarted when neither Pete nor Mary authenticated the letter.[17] Additionally, Pete provided testimony, without objection, that Good had reacted to Stewart's sexual abuse of Pete by telling them that "everything was okay" and that "it was perfectly normal."

And we must also consider Good's defensive theory. At trial, Good advanced the theory that Pete had fabricated his allegations against Good as a way to avoid prosecution for his own confessed sexual abuse of his sister Farah. Good's Louisiana conviction did nothing to rebut or otherwise undermine this defensive theory or bolster Pete's credibility as to his own allegations against Good.

The parties' closing arguments illustrate how Pete's testimony—and hence, his credibility—was the crux of this case. Both the State and defense spent the bulk of

---

[17]Although the trial court refused to admit the letter into evidence when Good offered it, it was included in the exhibit index of the reporter's record. On cross-examination, Pete testified that he "got in trouble when [he] was 16" and "had to go back to Louisiana." While he was living in Louisiana, Good wrote him some letters. Pete denied that he had ever replied to those letters, and when shown the letter marked Defendant's Exhibit 1, Pete denied writing it, but he acknowledged that the envelope he was shown was postmarked May 29, 2014, in Baton Rouge, Louisiana. When shown the letter on cross-examination the following day, Mary testified, "This doesn't look like [Pete]'s handwriting now. It doesn't sound like him either. . . . That doesn't look like my son's handwriting. . . . He told me he's never written his father ever."

their closing arguments discussing Pete and his allegations, as well as his having sexually abused Farah but receiving an immunity deal from the State in exchange for his testimony against Good. Although the State mentioned Good's "plea of guilty" and "what he got in Louisiana" in closing, it quickly moved on to other subjects, including Pete. If anything, the State *deemphasized* any error in the admission of Good's Louisiana case when it argued to the jury at the merits phase of trial that "we are not here to talk about the appropriate punishment right now, right, or [whether] what he got in Louisiana was the appropriate punishment. That is for the next phase [of the trial]. You are just here to simply say, I believe [Pete]."

In contrast, Good's attorney took a more direct and emphatic approach. In his closing argument, he acknowledged to the jury that Good had "pled guilty and received 10 years in Louisiana for what he did to" Farah and later referenced "all th[ose] horrible, disgusting things other than what [the jury had] heard [Pete] testify about" and told the jury that "the law allows you to hear that under the theory that, hey, somebody did it once, they're more likely to do it again, right?"

We do not mean to suggest that Good's concerns regarding the influence this evidence would have had on the jury were unfounded. During voir dire, Good asked the venire the following scaled question:

> So a person who sexually abused a child will reoffend. So a 10 would be strongly agree. That's, yeah, you did it once, you're absolutely going to do it again, there's no stopping you, okay? A 0 would be absolutely not, you know, nobody is ever going to reoffend and then everything in between there, okay?

17

The 12 venirepersons who ended up comprising the jury gave answers to this question ranging from 6 to 8, indicating that they believed it more likely than not that a person who had sexually abused a child would reoffend. However, this does not mean that the admission of Good's Louisiana conviction harmed him. We have no way of knowing from the record how much weight the extraneous conviction carried with the jury relative to all the other evidence of Good's extraneous sexual conduct.

And the jury might not have considered the conviction at all. The jury charge contained an instruction that forbade them from considering the Louisiana conviction as evidence of character conformity—the very purpose for which the State sought admission of the evidence under Article 38.37:

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed crimes, wrongs or acts other than the crime alleged in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other crimes, wrongs or acts, if any were committed, and even then *you may only consider those other crimes, wrongs or acts in determining the proof of motive, opportunity, intent, preparation, plan, knowledge, identi[t]y, or absence of mistake or accident, if any, in connection with the crimes alleged in the indictment in this case and for no other purpose.* [Emphasis added.]

Because we must presume that a jury follows a trial court's instructions regarding the consideration of evidence, *Upchurch v. State*, 656 S.W.3d 170, 182 n.6 (Tex. App.—Fort Worth 2022, no pet.), we would ordinarily presume that the jury only considered the testimony about Good's Louisiana conviction if they found and believed beyond a reasonable doubt that he had committed the offense of indecent

18

behavior with a juvenile against Farah in Louisiana.

But here there is an ambiguity in the jury charge. The next paragraph following the instruction we have quoted above reads as follows:

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses, wrongs, or acts other than the offenses alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such offenses, wrongs, or acts, if any were committed, then (1) *you may consider these acts for any purpose on relevant matters, including the character of the Defendant and acts performed in conformity with the character of the Defendant*, or (2) to consider the state of mind of the defendant and the child as well as the previous and subsequent relationship between the defendant and the child, if any. [Emphasis added.]

This instruction conflicts with the preceding instruction regarding the purposes for which the jury could consider the Louisiana conviction. And we have no way of knowing from this record how the jury resolved this ambiguity. If they followed the first instruction, then they did not consider Good's Louisiana conviction as evidence that he acted in conformity with his character; if they followed the second instruction, then they *may* have considered the conviction as such. But without more, the jury charge does not support a holding that Good's substantial rights were affected by the admission of his prior Louisiana conviction.

We conclude our harm analysis by noting that Good did not object when Weber testified regarding the Louisiana conviction on direct examination:

> Q. Okay. Did you later come to find out that most of what happened with [Farah] happened in Louisiana and Arkansas?

19

A. That's correct.

Q. Okay. Is it your understanding the defendant was prosecuted for that in Louisiana?

A. That's correct.

Q. And what's your understanding of what he received over there?

A. I believe ten years.

Q. Okay. As a result of a plea deal?

A. Yes, ma'am.

A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained of ruling. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).[18]

We conclude that, in the context of the entire case against Good, any error in the trial court's admitting Good's Louisiana conviction for character-conformity purposes under Article 38.37 did not have a substantial or injurious effect on the jury's verdict and did not affect Good's substantial rights. *See King*, 953 S.W.2d at 271–73. Because we must disregard the error, if any, we overrule Good's lone appellate issue. *See* Tex. R. App. P. 44.2(b).

---

[18]Although Good had received a running objection to Corporal Safdar's, Farah's, and Kaitlyn's testimonies about his extraneous conduct at the conclusion of the hearing outside the jury's presence, Weber did not testify at that hearing. Thus, his trial testimony was outside the ambit of Good's running objection.

### III. Conclusion

Having overruled Good's issue, we affirm the trial court's judgments.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 26, 2026